434 P.2d 636

**STATE of Arizona, Appellee,**

v.

**Richard CLARK, Appellant.**

No. 1723.

Supreme Court of Arizona,
In Banc.
Dec. 6, 1967.

Darrell F. Smith, Atty. Gen., Jordan Green, Asst. Atty. Gen., for appellee.

Vernon B. Croaff, Public Defender; Grant Laney, Deputy Public Defender, for appellant.

BERNSTEIN, Chief Justice.

The defendant, Richard Clark, appeals from a conviction of second degree murder rendered in the Superior Court of Maricopa County, and from the imposition of a sentence of not less than twelve nor more than twenty years in the Arizona State Prison for the murder of his wife, Evelyn Clark.

On October 8, 1965, at approximately 1:30 P.M., the defendant accompanied by his friend, Slim Lottridge, went out to the desert for some target practice. Defendant had been drinking a considerable amount of beer and vodka during the day. After completing target practice he returned to the home of Frank Bennett, one of his friends, and fell asleep there for about an hour. Thereafter, Mrs. Clark arrived and an argument ensued between the defendant and his wife, after which he left. After telling Bennett, "I should kill that bitch," the defendant left for his home at about 9:00 P.M. When he arrived home he had another argument with his wife over some financial problems, and then went to sleep. Defendant claims that he was awakened by a noise and found his wife dead in the kitchen. He also testified that he could not remember anything from the time he found his wife's body until the following morning. Mrs. Clark died from gunshot wounds to the head.

At this point there is some conflict in the evidence. However, we must view the evidence in the light most favorable to sustaining the conviction. State v. George, 95 Ariz. 366, 390 P.2d 899 (1964). With this in mind the following facts are revealed by the record. Defendant returned to the home of Bennett around 11:00 P.M., carrying a partially consumed bottle of vodka, and admitted to Bennett that he had shot and killed his wife. He asked Bennett to help him get out of town, but Bennett refused. The defendant then threatened Bennett, and was thrown out of the house. Shortly thereafter, Dana Lottridge, Bennett's next door neighbor, ar-

rived home and found defendant sprawled on her front porch. She told him to get up and he replied, "Evy is that you?" When Mrs. Lottridge answered in the negative the defendant said, "That is right, it couldn't be Evy, I shot her and killed her." The defendant was then helped into his car and drove away.

Around 11:30 P. M. Officers Stephens and Raughan of the Phoenix Police Department observed the defendant's vehicle being driven without lights and weaving all over the road. They stopped the car and asked defendant to step out, and when he did it was apparent that he was intoxicated. The officers placed the defendant in their patrol car, and advised him that he had the right to remain silent and that he could call an attorney. They then proceeded to administer a "Visual Test" to determine whether he was driving under the influence of intoxicants. After concluding that the defendant was operating his vehicle while under the influence of liquor the officers took him to the police station, and there administered a "Breathalizer Test", the result of which showed that defendant had 0.38 per cent alcoholic content in his blood.

Before the "Breathalizer Test" was administered, however, Officer Stephens asked the defendant a question. Stephens had noticed some bloodstains on the defendant's shirt when he was first picked up, and now asked the defendant where they came from. Defendant stated that his wife had her teeth pulled and had been crying on his shoulder. After the "Breathalizer Test" was completed Officer Stephens asked the defendant if he wished to call an attorney or his wife, to which the defendant answered, "She is dead, she had been dead for a long, long time."

The following day the defendant was questioned by another officer, and after being advised of his rights, and without being coerced admitted that he did not know whether he shot his wife or not.

■ On appeal the defendant contends that the trial court committed reversible error when it failed to grant his requested Instruction No. 8. The defendant argues that his requested instruction more fully explains the exception to the general rule that intoxication is not a defense to a crime. However, the trial court not only gave an instruction phrased in language from A.R.S. § 13–132, but also added explanations to the words of the statute. A.R.S. § 13–132 explains the general rule that voluntary intoxication is never a defense to a crime, but it also states that the jury may take into consideration the defendant's intoxication in determining whether he was capable of forming the necessary intent, or purpose, proof of which may be required as an element of a particular offense. The additional informative phrases given by the trial court in its instruction is the language used by our court in State v. Hudson, 85 Ariz. 77, 331 P.2d 1092 (1958), and correctly instructs the jury that voluntary intoxication is to be considered in determining the presence or absence of malice aforethought, which distinguishes murder from manslaughter. See also, State v. Saunders, 102 Ariz. 565, 435 P.2d 39 (decided November 29, 1967).

Since the court's instruction adequately informed the jury as to the legal effect of intoxication, it properly refused an instruction which covered the same subject matter. State v. Sorrell, 95 Ariz. 220, 388 P.2d 429 (1964).

■ Next we turn our attention to the defendant's statement that the bloodstains on his shirt were caused by his wife crying on his shoulder after she had her teeth pulled, and his subsequent inconsistent remark that his wife had been dead for a long time.

Defendant contends that the failure of Officer Stephens to advise him that what he said could be used against him in court rendered the statements elicited involuntary. However, since the trial of this case began on March 31, 1966, the requirements of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),

are not controlling. The Supreme Court of the United States in Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), held that the Miranda decision only applied to those persons whose trials began as of June 13, 1966. Although Miranda requires that the police advise a person in custody, and in certain other instances, that what he says can be used against him in court, nevertheless, such advice was not required prior to that decision. State v. Preis, 89 Ariz. 336, 362 P.2d 660 (1961); Wagner v. State, 43 Ariz. 560, 33 P.2d 602 (1934). Indeed, as late as 1964 this court reaffirmed its prior holdings when in State v. McGilbry, 96 Ariz. 84, 88, 392 P.2d 297, 299, we said:

".* * * it is the better and safer course to advise the defendant that what he says could be used against him at the trial * * * but it is not necessary to render either a confession or admission admissible."

Finally, defendant contends that because he was intoxicated at the time he made the exculpatory statements that those statements are involuntary, and therefore inadmissible.

The general rule with respect to confessions made by a person under the influence of intoxicants can be summarized as follows: proof that the accused was intoxicated at the time he confessed his guilt will not, without more, prevent the admissibility of his confession. See e. g., Commonwealth v. Chapman, 345 Mass. 251, 186 N.E.2d 818 (1962); People v. Dorman, 28 Cal.2d 846, 172 P.2d 686 (1946); 69 A.L.R. 2d 361. However, if it is shown that the accused was intoxicated to such extent that he was unable to understand the meaning of his statements, then the confession is inadmissible. Roper v. People, 116 Colo. 493, 179 P.2d 232 (1947).

In the case before us the defendant did not make a confession, but rather exculpatory statements. Nevertheless, the same rules apply. Although the evidence clearly shows that defendant was intoxicated at the time he made these statements, the record indicates that he still had sufficient mental capacity to understand what he was saying.

Certainly, any man who can manufacture the excuse that bloodstains on his shirt came from his wife's mouth after having her teeth pulled has the control over his mental faculties to understand what he is saying. Moreover, the fact that defendant asked Bennett to help him get out of town clearly shows that he had the mental awareness to attempt to escape the consequences of his act. Of course, the jury may consider intoxication in determining whether the statements are true or false. As the New York Court of Appeals stated in People v. McQueen, 18 N.Y.2d 337, 274 N.Y.S.2d 886, 221 N.E.2d 550 (1966),

"* * * the jury might apply the ancient maxim *in vino veritas*. The fact that [he] had been drinking bore upon the truth or falsity of [his] statements but was not, in itself, evidence that they were involuntary."

274 N.Y.S.2d at 892, 221 N.E.2d at 554. (Emphasis in original.)

In any event, when Officer Stephens asked the defendant where the bloodstains came from there was not the slightest suspicion that a murder had been committed. No investigation had as yet begun to focus on a particular suspect, for the police had no idea that a murder had been perpetrated. Furthermore, Officer Stephens advised the defendant that he could call an attorney or his wife. His language was in the form of advice, not a question. More important, as soon as the police realized that something was peculiar they immediately refrained from asking any further questions. Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), was designed to prevent the police from deriving any benefit from the use of overbearing tactics. In this case, however, the police were careful not to question the accused once they realized he might be in-

volved in something far more serious than a drunken driving charge.

No error appearing from the record the judgment is affirmed.

McFARLAND, V. C. J., and STRUCK-MEYER, UDALL and LOCKWOOD, JJ., concur.