554 P.2d 1272
The STATE of Arizona, Appellee,

v.

Bobby Reed MAGBY, Appellant.

No. 3112.

Supreme Court of Arizona,
In Banc.

July 20, 1976.

Bruce E. Babbitt, Phoenix, Atty. Gen., by Heather A. Sigworth, Asst. Atty. Gen., Tucson, for appellee.

John M. Neis, Pima County Public Defender, by Anne-Marie Brady, Asst. Public Defender, Tucson, for appellant.

CAMERON, Chief Justice.

This is an appeal by defendant, Bobby Reed Magby, from a jury verdict and judgment of guilt to the crime of first degree murder, A.R.S. §§ 13–451 and 452, with a sentence of life in the Arizona State Prison without the possibility of parole prior to the serving of 25 calendar years in the state prison.

Defendant raises the following questions on appeal:

1. Was it error to permit defendant's probation officer to testify concerning statements made by defendant while in custody and without first being given his Miranda warnings?

2. Were certain statements made by Magby inadmissible because he was intoxicated?

3. Did the court err in permitting a psychiatrist who examined defendant to determine his competency to stand trial to also testify as to statements made by Magby concerning the crime?

4. Did the court err in admitting the testimony of a psychiatrist who examined defendant concerning his competency to stand trial to also testify as to defendant's sanity at the time of the crime?

5. Was the first degree murder instruction an incorrect statement of the law?

6. Does the evidence support a verdict of first degree murder?

The facts necessary for a determination of this matter are as follows. On the morning of 22 December 1973, Magby and his friend, Wayne Siegfred, began drinking a mixture of vodka and orange juice from a wine jug. Later that morning, after replenishing their vodka and orange juice, Magby and Siegfred went to Carl's Body Shop where they joined several other men, including the victim Danny Clay. The men spent their time drinking, talking and shooting a sling shot.

Magby and Clay got into a fight about 12 noon. Magby punched the victim twice before Clay retaliated and knocked Magby to the ground. Clay and another man, Larson, picked Magby up and helped him into his van. While assisting Magby, Clay apologized for having hit him.

Magby later emerged from the van carrying a sawed-off shotgun. Magby tapped Clay on the shoulder to get his attention, yelled an obscenity and shot the victim in the face from a distance of less than six feet. The entire right side of Clay's head was blown off.

An eyewitness, Ralph Vogler, testified as follows:

"Q What, if anything, happened after he came around from the area of the van and the Buick?

"A Wayne tried to get a drink from him. He backed off and let Wayne have the jug for a drink and then he backed off over here a little bit and then Bobby come out. We sit here talking, me and Loser, sit here talking and Bobby came around between the van and walked around Danny Clay and tapped him on the shoulder and said a couple of words and had a shotgun in his hand raised up, pointed at his nose and the hammer was cocked.

I stepped back trying to bet behind Bobby and we was right next to the wrecker and then lit off with the shotgun.

"Q Did he say anything before that?

"A Used a few foul words.

"Q What did he say?

"A 'Hey, mother-fucker,' and then hesitated a little bit and blew him away."

And Magby's friend "Loser" testified:

"Q Mr. Siegfred, at this point simply tell us as best you can remember without regard to what other people told you what you remember happening when you came out after making the telephone call and what in fact you did.

"A I came out from inside the shop, went between my van and the car. Before I got into the van I put my hands up like this (indicating), swiveled myself around and pulled myself onto the chest. Both doors were open. As I was getting in, about half-turn, I heard the gun go off. I seen about that much, but I didn't see it until I was just turning. About that time it was off.

\* \* \* \* \* \*

"Q Now, just before you saw the barrel and heard the shot, did Mr. Clay raise his hand at all or did he do anything with his hands?

"A Well, he was holding the jug.

"Q Did he raise his hand up with the jug?

"A (No response)

"Q Let me rephrase that. How was he holding the jug?

"A One finger on it.

"Q Were his arms to the side or were they above his head. Where were they?

"A Well, from what I heard, kind of relaxed, holding the jug like this and one arm down (indicating).

\* \* \* \* \* \*

"Q Did you hear anybody say anything just before the shot was fired?

"A Yes.

"Q Who was that?

"A Bobby.

\* \* \* \* \* \*

"Q How much time elapsed between the time that he made that statement until the time when you actually heard the boom?

"A Well, all at the same time."

And:

"Q Did you actually see Mr. Magby after the shot was fired?

"A A few seconds afterwards, yes.

"Q Was he holding the shotgun at this time?

"A Yes."

Magby then fled on foot. About one hour later he was apprehended by the police when he was discovered passed out in a truck.

An information was filed on 3 January 1974 charging Magby with the first degree murder of Daniel Joseph Clay. On 2 December 1974, the jury found Magby guilty of first degree murder. From this verdict and the judgment of the court defendant appeals.

### TESTIMONY OF PROBATION OFFICER

Defendant argues that it was error to permit his probation officer, John Burch, to testify concerning statements made by defendant while in custody. We agree.

Two days after defendant was arrested, Burch visited him at the jail and without giving him the *Miranda* warnings, asked him about the shooting of Clay. At the trial, Burch testified as follows:

"Q And, did you start asking him questions at this time?

"A I asked him to tell me if he would, what transpired, what happened, why he was there.

"Q And what did he say?

"A He related to me in his own words more or less what happened.

\* \* \* \* \* \*

"Q What specifically did he say about the shooting incident itself?

"A Just the fact that he had gone to the truck, gotten the gun, and returned and shot the guy."

■ We have held that statements to a probation officer about crimes committed during the term of probation are admissible in a hearing to revoke probation, *State v. Fimbres,* 108 Ariz. 430, 501 P.2d 14 (1972), and this would be true regardless of whether the probationer was read his *Miranda* rights prior to such admissions. We have also held that a confession of a crime to a probation officer without *Miranda* warnings after conviction of that crime may be used by the judge in sentencing. *State v. Jones,* 110 Ariz. 546, 521 P. 2d 978 (1974). We do not believe, however, that in-custody statements about a later crime made to a probation officer without *Miranda* warnings should be admissible in the State's case when the probationer is later tried for that crime. We agree with the Kansas Supreme Court:

> "We hold the *Miranda* decision places a duty upon the officers of the Kansas State Boaːd of Probation and Parole, when they are investigating the commission of a fresh or new felony by a parolee, to comply with the mandate in *Miranda,* if the incriminating statements they elicit from a parolee are to be admissible as evidence in the prosecution of the new offense. On the facts in this case the incriminating statements made by the appellant to the parole officer were inadmissible in evidence." *State v. Lekas,* 201 Kan. 579, 584, 442 P.2d 11, 16 (1968).

Although one jurisdiction has held that a defendant, by accepting probation, in effect, makes a continuous waiver of his *Miranda* rights, *Nettles v. State,* 248 So.2d 259 (Fla.App.1971), we believe that *Miranda* must be followed before statements to a probation officer concerning a new crime may be admitted at the trial of that new crime. The Fifth Circuit has stated:

> "\* \* \* We have considerable doubt as to the propriety of even calling the parole officer as a witness for such a purpose. But, pretermitting that, we have no doubt that the testimony was inadmissible unless the officer gave prior *Miranda* warnings. A parolee is under heavy psychological pressure to answer inquiries made by his parole officer, perhaps even greater than when the interrogation is by an enforcement officer." *United States v. Deaton,* 468 F.2d 541, 544 (5th Cir. 1972). See also *State v. Gallagher,* 38 Ohio St.2d 291, 313 N.E. 2d 396 (1974), vacated and remanded, 425 U.S. 257, 96 S.Ct. 1438, 47 L.Ed.2d 722.

The admission of Burch's testimony was error.

## WERE CERTAIN STATEMENTS BY DEFENDANT INADMISSIBLE BECAUSE HE WAS INTOXICATED?

■ During the time defendant was being "booked" at the jail, he was read his *Miranda* rights. When asked if he would answer some questions he responded by asking if he could make a telephone call which he was allowed to do on the phone in the station house. He called his girl friend and made several admissions which were overheard by the police officers who testified to the conversation at the trial. Defendant is reported to have said to his girl friend as to why he was in jail:

> "Because I just blew some mother-fucker away \* \* \* because he was beating on my head and I don't let no mother-fucker beat on my head."

Later, when defendant gave blood for a blood alcohol test, he was asked if he would answer some questions and refused but later made other admissions stating:

> "I think this whole thing should be considered self-defense. The man knocked me down twice. I told him not to do it

again. He looked like he was going to do it again so I got my gun and blew his fucking head off. Lord help me, but that is what I did. I blew his fucking head off."

Defendant asserts that since he was intoxicated at the time he made these statements to his girl friend and the police, these admissions were inadmissible at his trial. We have stated:

" * * * proof that the accused was intoxicated at the time he confessed his guilt will not, without more, prevent the admissibility of his confession. * * *" *State v. Clark,* 102 Ariz. 550, 553, 434 P.2d 636, 639 (1967).

In the instant case, though it is obvious that defendant was under the influence of alcohol, the testimony of the officers does not indicate that the statements were so influenced by the intoxication so as to be involuntary or untrustworthy.

The testimony of the officer indicates that the defendant's speech was not slurred, that he stood while using the telephone, that he appeared to understand what was being said to him and what he voluntarily said to the officers and his girl friend. The nurse who took the blood sample testified defendant was cooperative and aware of his surroundings. We find no error.

## STATEMENTS TO THE PSYCHIATRIST

Defendant contends it was reversible error to permit Dr. John Clymer, a psychiatrist, to testify to statements made by defendant concerning the shooting. Dr. Clymer was one of the psychiatrists appointed to determine whether defendant was competent to stand trial. At the hearing on defendant's competency to stand trial, the defendant objected to any testimony concerning the facts of the shooting. Defendant's objections were sustained. At the trial itself, at which time defendant's sanity at the time of the shooting was an

issue, the State called Dr. Clymer and after other testimony asked him the following:

"Q Now Doctor, I want to go specifically into what Mr. Magby told you on February— I believe the 28th— in reference to the incident itself.

"A In reference to the incident itself, that he was with his friends, that they had this Christmas bottle that they were drinking and that Clay had gotten into a scuffle with him, broke it up and that Clay had come down on him again and this was Wayne Siegfred who hollered at him and then he says, 'There was this flash and then I was running through the desert and they found me in a car and I was taken to the emergency room at Pima County Hospital. I had some scratches on my face and then to jail.'

This is the verbatim account of what he told me about the episode."

The disclosure of this information violated Rule 11.7(b)(1), Arizona Rules of Criminal Procedure 1973, 17 A.R.S. The rule which deals with mental examinations to determine competency, provides:

"b. *Privileged Statements of Defendant*

"(1) No statement of the defendant obtained under these provisions, or evidence resulting therefrom, concerning the events which form the basis of the charges against him shall be admissible at the trial of guilt or innocence, or at any subsequent proceeding to determine guilt or innocence, without his consent."

And A.R.S. § 13–1621 provides:

"J. In any of these proceedings, both the defendant and the state shall have the right to have the defendant examined by psychiatrists appointed by the court for the purpose of presenting testimony at any appropriate hearing. Information obtained from the defendant under these provisions shall not be used against him at any trial in which his

guilt or innocence is to be determined, unless the defendant consents."

And we have stated:

"The obvious policy underlying the physician-patient privilege is that patients should be encouraged to make full and frank disclosures to those who are attending them. While we do not believe that allowing Dr. Baker to testify about his conclusions concerning defendant's sanity derogates from this policy, we do think that to permit even a psychiatrist acting for the court to transmit a defendant's incriminating statements to a jury is fundamentally unfair. * * *" *State v. Evans,* 104 Ariz. 434, 436, 454 P.2d 976, 978 (1969).

Both Rule 11.7(b)(1) and A.R.S. § 13-1621 provide that evidence obtained concerning the crime may not be presented without the consent of the defendant. Although the defendant made no objection to the introduction of the evidence, we believe that something more is required. The record must affirmatively show that the defendant did, in fact, consent to the introduction of this evidence.

We believe it is error to introduce this evidence at the trial without a showing of defendant's consent. To allow this information to be admitted without defendant's consent would have a chilling effect on the honest and free flow of information between the doctor and patient while the patient is being examined as to his competency to stand trial. This court has stated:

"* * * We believe that insulating a defendant from the possibility that an examining psychiatrist will repeat on the stand defendant's 'confession' to him or other damaging admissions will promote the free interplay between patient and physician which is essential to obtaining a clear picture of defendant's mental health. * * *" *State v. Evans,* supra, 104 Ariz. at 436, 454 P.2d at 978.

We hold it was error to admit this testimony by Dr. Clymer.

## DID THE TRIAL COURT ERR IN ADMITTING DR. HOOGERBEETS' TESTIMONY?

Dr. Jacob D. Hoogerbeets also examined defendant for competency and testified at the competency hearing. At the trial, Dr. Hoogerbeets was called as a rebuttal witness by the State to testify as to defendant's sanity at the time of the offense. The defendant filed a written motion to preclude Dr. Hoogerbeets from testifying at the trial concerning the defendant's sanity at the time of the offense which motion was denied.

The defendant argues that a psychiatrist appointed to examine a defendant solely for the purpose of determining the defendant's competence to stand trial may not thereafter testify as to the defendant's mental state at the time of the offense. We disagree. While the psychiatrist may not testify without consent as to defendant's admissions concerning the crime itself, he may give his opinion, if he has any, and if there is a proper foundation, as to defendant's sanity at the time of the offense. We agree with the reasoning of our Court of Appeals (Rule 250 is the predecessor to Rule 11 of the 1973 Rules of Criminal Procedure):

"The defendant raised the question concerning the propriety of a qualified medical expert who examines a defendant under Rule 250, Rules of Criminal Procedure, 17 A.R.S., to testify as to the sanity of a defendant at the time of the commission of the crime in question. It is not to be assumed that a mental examination under Rule 250 is as thorough as a mental examination to determine sanity at the time of the commission of the offense. (citation omitted) However, it is our opinion that if there can be established a foundation upon which the medical expert is able to base an opinion as to a defendant's sanity at the time of the commission of the offense that he would be qualified to testify, the limited type examination going merely to the weight

of the testimony." *State v. Sexton,* 4 Ariz.App. 41, 43, 417 P.2d 554, 556 (1966).

We find no error.

## FIRST DEGREE MURDER INSTRUCTION

 The defendant contends that "the trial court's instruction to the jury on first degree murder unduly stressed the rapidity of the thought process and failed to emphasize the requirement of premeditation and deliberation." We disagree. We have stated:

" * * * [t]here need, however, be no appreciable space of time between the intention to kill unlawfully and the act of killing. They may be as instantaneous as the consecutive thoughts of the human mind." *State v. Eisenstein,* 72 Ariz. 320, 333, 235 P.2d 1011, 1020 (1951).

The court in the instant case instructed the jury as follows:

" * * * There is no prescribed period of time which must elapse between the formation of the intent to kill and the act of killing. It does not matter how quickly or slowly these mental processes succeeded each other or how quickly or slowly they are followed by the act of killing.

"In order to find a deliberate and premeditated killing you must find more reflection on the part of the defendant than is involved in the mere formation of the specific intent to kill."

Premeditation need not be prolonged. In the instant case, defendant, after being helped into the van, had time to remove the gun from its place in the van, get out, walk around the van to victim's back and wait for him to turn around. We think there was sufficient evidence of premeditation from which the judge could instruct and the jury could find that the defendant was guilty of a wilful, deliberate, and premeditated killing. *State v. McIntyre,* 106 Ariz. 439, 477 P.2d 529 (1970). We be-

lieve the instruction in this case on deliberation and premeditation correctly states the law. *State v. Richmond,* 112 Ariz. 228, 540 P.2d 700 (1975); *State v. Maloney,* 101 Ariz. 111, 416 P.2d 544 (1966).

## DOES THE EVIDENCE SUPPORT A VERDICT OF FIRST DEGREE MURDER?

Defendant contends that the evidence does not support a conviction for first degree murder. The defendant contends:

(a) There was no showing of express malice aforethought to support a finding of first degree murder.

(b) Defendant was so intoxicated that he was incapable of premeditation.

(c) There was adequate provocation to reduce the charge from murder to manslaughter.

### (a) *Malice*

 Absent justification, *State v. McIntyre,* supra, the jury may find malice from the use of a gun or other deadly weapon. *State v. Duke,* 110 Ariz. 320, 518 P.2d 570 (1974); *State v. Sellers,* 106 Ariz. 315, 475 P.2d 722 (1970). Defendant contends that there are two types of malice aforethought, express and general, and that the inference of malice from the use of a gun will support general malice only and that the most defendant could be convicted of is second degree murder as there must be specific malice to support first degree murder. We disagree. Our statute does not admit to such a result:

"§ 13–451. *Murder and malice aforethought defined*

"A. Murder is the unlawful killing of a human being with malice aforethought.

"B. Malice aforethought may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take way the life of a fellow creature. It is implied when no considerable provocation appears or when the circumstances attending the killing show an abandoned and malignant heart."

Malice aforethought is an element of murder and distinguishes murder from manslaughter. Both express and implied malice will support a conviction of murder. In the instant case, there was a sufficient showing of malice aforethought to support a conviction of murder.

### (b) *Defendant's Intoxication*

Magby next contends that he was intoxicated to such an extent that his first degree murder conviction should be reduced to manslaughter, or in the alternative to second degree murder, because defendant's intoxication negated premeditation and deliberation. We disagree. The jury was given an instruction on both grades of murder as well as voluntary manslaughter. Evidence was introduced at trial which showed that Magby had consumed a substantial amount of alcohol at the time of the offense and had a blood alcohol content of .26 taken 3 to 4 hours after the shooting. The jury was properly instructed that voluntary intoxication may produce a state of mind which incapacitates an accused and prevents him from forming the malicious intent or malice aforethought which is an essential element of murder. *State v. Coward,* 108 Ariz. 270, 496 P.2d 131 (1972). Whether the intoxication negated the malice and reduced the crime from murder to manslaughter is a question of fact to be determined by the jury. *State v. Duke,* supra.

### (c) *Provocation*

Finally, defendant alleges that the evidence supports his contention that the fight between him and Clay was adequate provocation to reduce the charge to voluntary manslaughter. We do not agree. The jury was properly instructed on the issue of provocation and whether there was adequate provocation to reduce murder to manslaughter is a question of fact to be resolved by the jury. *Roser v. State of Arizona,* 45 Ariz. 264, 42 P.2d 613 (1935).

We find no error.

### DISPOSITION

We have noted that it was error to admit the testimony of the defendant's probation officer and Dr. Clymer concerning defendant's statements about the shooting. We do not believe, however, that these errors mandate reversal. The facts of the shooting were testified to at the trial by two eyewitnesses and sustained by other admissible testimony. The statements by the probation officer and Dr. Clymer, while erroneous, were merely cumulative evidence of the accused's guilt which was overwhelmingly established by other evidence and did not contribute to the verdict, and we believe were harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

Judgment affirmed.

STRUCKMEYER, V. C. J., and HOLO-HAN and GORDON, JJ., concur.

HAYS, Justice (specially concurring).

I concur in the majority opinion except that I cannot agree that testimony from a psychiatrist concerning defendant's statements as to the events surrounding the charge creates fundamental error. Although this error is not specifically denominated as such in the majority opinion, the requirement that there must be an affirmative showing on the record of consent by the defendant himself spells out fundamental error without mentioning it.

The list of requisite litanies continues to grow as the search for truth becomes an obstacle race rather than a dash, and juries sit impatiently while court and counsel in chambers make affirmative showings for the record. It is no abuse of due process in my mind to require the defendant to object before such testimony is barred. If defense counsel elicits the proscribed testimony from a psychiatrist, where is the affirmative showing of defendant's consent? Does this fundamental error mandate reversal?