THE STATE OF OHIO, APPELLEE, *v.* GALLAGHER, APPELLANT.

[Cite as State v. Gallagher (1976), 46 Ohio St. 2d 225.]

(No. 73-623—Decided May 19, 1976.)

*Mr. Lee C. Falke,* prosecuting attorney, and *Mr. Randal A. Anderson,* for appellee.

*Mr. Jack T. Schwarz,* for appellant.

*Per Curiam.* Following our judgment in this case, appellee appealed to the Supreme Court of the United States. That court granted certiorari (420 U. S. 1003), and, under a mandate of April 5, 1976, vacated our judgment and remanded the cause to this court "to permit * * * [this] court to explicate whether or not * * * [our] judgment relies on federal law." 44 L. W. 4475, 4476.

Preceding and explanatory of the quoted mandate are the following statements of the majority of the court:

"From the briefs and oral argument, we are unable to determine whether the Ohio Supreme Court rested its decision upon the Fifth and Fourteenth Amendments to the Constitution of the United States, or Section 10, Article I of the Ohio Constitution, or both. In its full opinion, the Ohio court cited with approval an excerpt from the opinion of the Court of Appeals for the Fifth Circuit in *United States* v. *Deaton,* 468 F. 2d 541 (1972), a case which, in the view of the state court, presented the precise question then before it. We are unsure whether the Ohio court made reference to *Deaton* merely to lend support to its view that a parolee is under heavy pressure to cooperate with his

parole officer or whether the court intended to demonstrate its reliance on a federal constitutional ground. Indeed, we cannot be certain that the Ohio court did not construe its constitutional provision to be identical to that contained in the Fifth Amendment and thus render judgment simultaneously under both state and federal law.

"* * * The italicized headnote[1] which appears in the instant syllabus can be read as a holding based only on points of *criminal law* and the law of *evidence*; it contains nothing to indicate that a point of federal *constitutional law* is decided. * * * [W]e decline to speculate from the choice of words used in the syllabus and the authorities cited by the author of the opinion as to which constitutional provision formed the basis for the judgment of the state court * * *." (Emphasis *sic*.)

The dissenting opinion of Justice Potter Stewart, in which Justices Marshall and Blackmun concur, states:

"It is clear to me that the judgment of the Supreme Court of Ohio rests upon both the Constitution of the state of Ohio and the Constitution of the United States."

Pursuant to the mandate hereinabove quoted we have reexamined our opinion in the subject case and certify as follows:

In the opinion in *State v. Gallagher, supra* (38 Ohio St. 2d 291), we rejected decisions of other state courts on the admissibility of inculpatory statements made to parole officers because the focus of inquiry in those cases was the applicability *vel non* of the *Miranda* case. The *Gallagher* facts required an analysis against the backdrop of the privileges against self-incrimination conferred by Section 10, Article I of the Ohio Constitution[2] and by the Fifth and

---

[1] The "italicized headnote" which follows the style in each of our opinions should not be understood to be included as a part of or "in the * * * syllabus" of any decision of this court. Such headnote is prepared by the reporter merely for indexing purposes.

[2] The privilege against self-incrimination, afforded by Section 10, Article I of the Ohio Constitution, reads:

"No person shall be compelled, in any criminal case, to be a witness against himself * * *."

Fourteenth Amendments to the United States Constitution. Thus, the narrow, factual question presented, at page 295, was "* * * whether appellant was compelled to produce evidence against himself or whether utterances to his parole officer were voluntarily given."

We were impressed by the unique position of power held by parole officers in this state.[3] And we concurred

[3]The Final Report of the Ohio Citizens' Task Force on Corrections (1971), at pages D31-D32, reads:

"Any parole officer has the statutory authority to have a parolee arrested and incarcerated in the local county jail if he has 'reasonable cause to believe' that the parolee has violated the terms of his parole. The parole officer must notify the Superintendent of Parole Supervision of the arrest and the reasons therefor 'as soon as practicable.' The superintendent is required to make an 'appropriate recommendation' to the APA [Adult Parole Authority] which must 'within a reasonable time' determine whether to declare the parolee a violator. If the parolee is declared a violator, he must be returned to the institution from which he was paroled.

"In practice, if a parolee is arrested by the police or a complaint is filed against him with his parole officer, the officer makes an investigation of the allegations and decides whether to have the parolee arrested. The officer might also cause an arrest to be made if he himself learns of violations of parole conditions. Once a parolee is arrested the parole officer submits a report concerning the alleged misconduct to the APA. The report is reviewed by top level members of the staff of the Superintendent of Parole Supervision who either ask the officer for additional information or make a decision based on the report. Their decision as to whether to declare the parolee a violator or release him is rubber stamped by the APA. *No hearing is held in the city where the alleged violation occurred* other than the parole officer's investigation. If the alleged violation consists of carrying a weapon or any assault more serious than a simple fistfight, the parolee can count on a quick trip back to 'the walls.' Currently the APA makes its decision within 30 days following arrest.

"If the parolee is declared a violator he is returned to the institution from which paroled. On the next visit of the parole board to that institution the violator is given a hearing for the purported purpose of determining when he will come before the board again. In fact, this is the parolee's first hearing concerning the alleged violation. If the parolee is from Cleveland, for instance, he is likely to be 150 miles away from any witnesses who might corroborate his story. The parole board, of course, will not bring witnesses into the institution and the violator is not permitted a lawyer. If the violator wants to dispute

in the observations of a federal court, that "[a] parolee is under heavy psychological pressure to answer inquiries made by his parole officer, perhaps greater than when the interrogation is by an enforcement officer," by agreeing "that a parolee is under heavy pressure to cooperate with his parole officer * * * [who, allegedly,] had the power to recommend the return to prison of a parolee under his charge, and that appellant might have assumed that his utterances were in some way confidential." *State* v. *Gallagher, supra* (38 Ohio St. 2d 291), at 296-297.

Accordingly, in reaching our initial decision herein we relied upon the Fifth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution. Although it is our view that we should reach the same conclusion under the Fourteenth Amendment, we were (and we are) in any event independently constrained to the result we reached by the Ohio Constitution. We so conclude by our construction and application of Ohio law. Regardless of whether there is or is not compulsion to the same end by the federal Constitution (see *Dept. of Mental Hygiene* v. *Kirchner* [1965], 62 Cal. 2d 586, 400 P. 2d 321, 322), we are mindful of the admonition of the Supreme Court of Minnesota that:

"We should not guess as to what the United States Supreme Court may do with its prior decisions, nor are we able to predict the bases upon which such supposed change

the charges, he states his case to the two members of the board before whom he appears. As a practical matter, the board members must rely on the parole officer's report and the parolee has almost no chance of prevailing on the question of whether he *did what he is accused of doing*. Sometimes the board grants the parolee 30 days to submit documentary evidence to support his contentions. This committee is of the opinion that: (a) the 'hearing' conducted at the prison by the board is a very bad joke as a fact-finding and adjudicating mechanism; and (b) the parole board members know it and are not comfortable trying to decide whether the parolee is telling the truth.

"The fundamental need in order to make parole violation hearings even minimally fair is a hearing conducted in the city where the violation purportedly occurred—where the witnesses and evidence are accessible to both sides." (Emphasis *sic.*)

of opinion are to be founded. Until that court overrules its former well-considered opinions there is no lack of uniformity between our interpretation of our Constitution and of that court's interpretation of the Fourteenth Amendment." *National Tea Co.* v. *State* (1940), 208 Minn. 607, 608, 294 N. W. 230, 231.

Inasmuch as we did not act solely by compulsion of the Fourteenth Amendment, either directly or in construing or in applying state law, we reinstate and reiterate our former decision as filed June 26, 1974, and issue the remittitur forthwith.

*Judgment accordingly.*

O'NEILL, C. J., HERBERT, STERN, CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.

CORRIGAN, J., dissenting. In the trial court, this defendant waived a jury, was tried by the court, and convicted of armed robbery. The person who was robbed, the cashier in the store, positively identified defendant as one of the two robbers.

On June 22, 1972, when defendant was under arrest for this robbery, he was fully advised of his rights to remain silent, to have an attorney present, and that anything he said could be used against him, under the *Miranda* case, by two detectives. He signed a waiver of those rights. He was on parole from the penitentiary for another crime. He was certainly familiar with the *Miranda* warnings. His parole officer visited him in the jail on two occasions in the next few days, during the second of which the defendant volunteered his participation in this robbery. The parole officer did not repeat the *Miranda* warnings on these visits, and there is no requirement that they be repeated. The parole officer testified as to defendant's admission to him of participation in the crime. The parole officer is not a law enforcement officer within the meaning of the *Miranda* case.

Whether the majority found that this armed robber's rights under the United States Constitution or under the Ohio Constitution were so ignobly violated that it is required to turn him loose, the record in the case establishes the fact absolutely that Terry L. Gallagher participated in the robbery. The conviction should be affirmed.