STATE OF NORTH CAROLINA v. BARRY DALE HOLCOMB

No. 9

(Filed 17 October 1978)

1. Criminal Law § 75.13— conversation between defendant and his uncles at sheriff's office—no custodial interrogation—admission of statements not prejudicial error

A conversation between defendant and his uncles at the sheriff's office which resulted in defendant's assistance in finding the murder weapon did not constitute a "custodial interrogation" so as to require the Miranda warnings, and the weapon and evidence of its location were properly admitted in defendant's murder trial even though defendant had not been given the Miranda warnings, where the conversation occurred with the permission of the police but there was no questioning initiated by the police, and there was no evidence that defendant's uncles were acting as agents of the police when they talked to defendant about the murder weapon. Furthermore, the admission of evidence of defendant's assistance in finding the weapon did not negate defendant's defense of insanity where the record shows that defendant had great difficulty directing officers to the area where he left the weapon, and the admission of such evidence was not prejudicial to defendant in light of the overwhelming evidence of defendant's guilt of the crime charged.

2. Homicide § 30.2— first degree murder trial—failure to submit manslaughter

In this prosecution for the first degree murder of defendant's father, the trial court did not err in failing to submit voluntary manslaughter as a possible verdict where the State's evidence tended to show that defendant saw his father sitting in a chair in the living room of his home, that defendant obtained a gun from his car, loaded it and returned to the carport door which led to the living room and shot his father, and that there had been no trouble between defendant and his father on the day of the shooting, and where defendant offered no evidence to rebut the State's evidence as to the nature of the crime but offered evidence tending to support only his plea of not guilty by reason of insanity.

3. Criminal Law § 122.2— urging verdict before evening is over—no coercion of verdict

The trial judge did not improperly coerce a verdict in this first degree murder case when he stated to the jury that the following day was Thanksgiving and that "If at all possible I would like to, in consideration of all concerned, have you reach a verdict before the evening is over, if you can," where the judge was careful to point out that he was not "attempting to rush you in any way or to try to dictate to you what you should or should not do."

4. Criminal Law § 122.2— urging jury to resolve differences—no coercion of verdict

The trial judge did not improperly coerce a verdict by his instruction, "If at all possible, you should resolve any differences and come to a common con-

State v. Holcomb

clusion so that this case may be completed," where the judge also emphasized that he was not endeavoring to inject his ideas into the minds of the jurors and stated that no jurors "should surrender their honest convictions."

APPEAL by defendant from *Kivett, J.*, at the 21 November 1977 Criminal Session of YADKIN County Superior Court.

Defendant was charged in a bill of indictment, proper in form, with the first degree murder of his father, Charles D. Holcomb, Sr. He entered pleas of not guilty and not guilty by reason of insanity.

The events which transpired on the day of the killing are uncontradicted.

On 8 May 1977, defendant was living with his parents and a brother and sister. Another brother, Benny, who lived in Greensboro, arrived at the home shortly before noon. Benny and defendant had lunch together, and before they finished eating, their father came into the house. When the two boys finished lunch, they went out into the yard. About fifteen minutes later, Benny came back into the living room where his father was seated. Mrs. Audrey Holcomb, defendant's mother, testified that she looked out the kitchen window and saw defendant walking towards the house with a gun. A shot was fired from the carport into the living room striking Mr. Holcomb in the head. Benny Holcomb testified that after his father was shot, he had a glimpse of a person in the door leading from the living room to the carport; and immediately thereafter, he saw Barry leaving in his truck. He had not authorized Barry to use the truck.

There was medical testimony that Mr. Holcomb's death was due to a gunshot wound to the head.

Defendant was arrested in Wilkes County later that afternoon by Bob Gregory of the Wilkes County Sheriff's Department. Gregory later turned defendant over to Deputy John Hicks, who immediately advised him of his rights. Defendant told Hicks that he understood his rights and did not want to make a statement until he had talked to his lawyer. Hicks then transported defendant to the Yadkin County Sheriff's office.

Bobby Smith and James Smith, defendant's uncles, were at the sheriff's office when defendant arrived. The two men had

been at the Holcomb residence when they learned that defendant had been arrested and was being taken to the sheriff's office. The testimony indicated that the men went to the sheriff's office because they felt that someone should be there to be with defendant and to "console" him.

At the trial, defendant's mother, brother, and sister, and other acquaintances testified for the defendant. This lay testimony was to the effect that defendant, who had been a normal and outgoing young man, had become withdrawn and on occasions exhibited abnormal behavior. Some of these witnesses related statements made by defendant which indicated that he was subject to hallucinations.

Dr. Royal, a psychiatrist who was responsible for defendant's evaluation and care at Dorothea Dix Hospital, testified that, in his opinion, defendant did not know right from wrong on the day of the shooting.

Dr. Rollins, Clinical Director of the Forensic Unit at Dorothea Dix Hospital, testified, in rebuttal, that he was not able to reach a conclusion as to whether or not defendant knew the difference between right and wrong on the day in question.

Other pertinent facts will be set out in our consideration of defendant's assignments of error.

The court instructed the jury that they could return a verdict of guilty of first degree murder, guilty of second degree murder, not guilty, or not guilty by reason of insanity. The jury returned a verdict of guilty of first degree murder.

*Rufus L. Edmisten, Attorney General, by Roy A. Giles, Jr., Assistant Attorney General, for the State.*

*N. Lawrence Hudspeth, III, and Larry G. Reavis, attorneys for defendant appellant.*

BRANCH, Justice.

[1] Defendant by his first assignment of error contends that the trial judge erred by denying his motion to suppress evidence concerning the location of the murder weapon and by ruling that the weapon was admissible into evidence.

Defendant argues that the dialogue between defendant and his uncles at the sheriff's office which resulted in his assistance in finding the murder weapon constituted a "custodial interrogation" which was conducted without the warnings or procedural safeguards required by *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966).

In *State v. Wright*, 274 N.C. 84, 161 S.E. 2d 581 (1968), *cert. denied*, 396 U.S. 934 (1969), we stated:

> *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602, lays down the governing principle that as a constitutional prerequisite to the admissibility of statements obtained from an accused during custodial police interrogation, the suspect must be advised in unequivocal terms (1) that he has a right to remain silent; (2) that anything he says can and will be used against him in court; (3) that he has a right to consult with a lawyer and to have a lawyer with him during interrogation; and (4) that if he is an indigent a lawyer will be appointed to represent him. . . .

These "Miranda warnings" are only required when an accused is about to be subjected to "custodial interrogation." *State v. Fletcher* and *State v. St. Arnold*, 279 N.C. 85, 181 S.E. 2d 405 (1971). "Custodial interrogation" is a questioning *initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom. *Miranda v. Arizona, supra*; *State v. Thomas*, 284 N.C. 212, 200 S.E. 2d 3 (1973).

This record discloses that defendant's uncles Bobby Lee Smith and James Smith were at the Charles Holcomb homeplace when they heard that defendant had been taken into custody. They immediately went to the sheriff's office in Yadkin County for the purpose of "consoling" defendant. At the sheriff's office, Bobby Lee asked Deputy Hicks if he had the weapon with him; and Hicks replied, "No, and he didn't tell me where it was." The uncles obtained permission from the police officers to talk with defendant in hopes of locating the apparently valuable rifle which belonged to deceased. After some conversation between them, defendant agreed to carry them to the place where he had left the rifle.

In our opinion, the discovery of the murder weapon did not result from "custodial interrogation." It is true that defendant

was in police custody, but there was no questioning *initiated by the police* concerning the murder weapon. Rather the conversation between defendant and his kinsmen grew out of a natural concern by defendant's uncles for the plight of defendant and occurred only with the permission of the police. Neither do we find merit or support in this record for defendant's contention that his uncles were acting as agents of the police when they talked with him concerning the murder weapon. Even had the evidence of the discovery of the weapon and the admission of the weapon into evidence been erroneous, we do not believe that the admission of this evidence would have contributed to defendant's conviction, particularly in light of the overwhelming evidence elicited from defendant's own family that he shot and killed his father with a gun. *State v. Fletcher* and *State v. St. Arnold, supra.* Nevertheless, defendant's counsel in his oral argument before this Court advanced, for the first time, the theory that the admission of this evidence weakened defendant's defense of insanity because his ability to lead others to the place where he had concealed the murder weapon was inconsistent with the evidence of insanity. The record does not lend support to this rather slender reed upon which defendant now relies for support. To the contrary, the record shows that defendant had difficulty directing the officers to the area where he left the weapon. He remembered only that he hung the gun on a tree limb, and he had a vague recollection of a rock quarry. It was only after his uncles and a deputy sheriff had driven through Wilkesboro to the Kerr Scott Dam area, then back toward Yadkin County, where some local men directed them to the rock quarry road, that the sheriff noticed some tracks going up a bank which led him to the weapon. We find little in this evidence which would negate defendant's defense of insanity.

We hold that the trial judge did not err when he denied defendant's motion to suppress evidence concerning the location of the murder weapon and that he correctly ruled that the gun was admissible into evidence.

[2] Defendant assigns as error the failure of the trial judge to submit voluntary manslaughter to the jury as a possible verdict.

Voluntary manslaughter is the unlawful killing of a human being without malice, express or implied, without premeditation and deliberation. *State v. Rummage*, 280 N.C. 51, 185 S.E. 2d 221 (1971); *State v. Benge*, 272 N.C. 261, 158 S.E. 2d 70 (1967).

Manslaughter is a lesser included offense of murder in the second degree. However, instructions on a lesser included offense are required only when there is evidence which would permit the jury to find that such included crime of lesser degree was committed by the accused. *State v. Stewart*, 292 N.C. 219, 232 S.E. 2d 443 (1977); *State v. Hicks*, 241 N.C. 156, 84 S.E. 2d 545 (1954).

In the case before us, the State's evidence tends to show that defendant saw his father sitting in his rocker-recliner chair in the living room of his home. Defendant thereupon went to his car, obtained a gun, loaded it and returned to the carport door which led into the living room and shot his father. There was evidence that defendant and his father did not get along very well, but there had been no trouble between them on the day of the shooting. The State's evidence made out a case of murder in the first degree, and defendant offered no evidence to rebut the State's evidence as to the *nature* of the crime. Defendant's evidence tended to support only his plea of not guilty by reason of insanity.

This record discloses no evidence which would support a verdict of manslaughter, and we, therefore, hold that the court properly refused to charge on that lesser included offense. We note, in passing, that defense counsel specifically requested the trial judge not to instruct on manslaughter. Ordinarily, one who causes the court to commit error is not in position to repudiate his action and assign it as grounds for a new trial. *State v. Payne*, 280 N.C. 170, 185 S.E. 2d 101 (1971); *Sumner v. Sumner*, 227 N.C. 610, 44 S.E. 2d 40 (1947).

[3] By his final assignment of error, defendant contends that portions of the trial judge's instructions improperly coerced the jury into returning a verdict. Prior to dinner recess between 6:00 p.m. and 7:00 p.m., the trial judge stated:

. . . Tomorrow is Thanksgiving. If at all possible, I would like to, in consideration of all concerned, have you reach a verdict before the evening is over, if you can. I want it to be clearly understood that the court is not, in any way, attempting to rush you in any way or to try to dictate to you as to what you should or should not do; but you have the responsibility to decide on the verdict in this case; and I'll not try to rush that or hamper you in any way in arriving at what

you consider to be a just verdict under the instructions I have given you.

On numerous occasions, this Court has said that a trial judge has no right to coerce a verdict, and a charge which might reasonably be construed by a juror as requiring him to surrender his well-founded convictions or judgment to the views of the majority is erroneous. *State v. Alston*, 294 N.C. 577, 243 S.E. 2d 354 (1978); *State v. Cousin*, 292 N.C. 461, 233 S.E. 2d 554 (1977); *State v. Roberts*, 270 N.C. 449, 154 S.E. 2d 536 (1967).

In instant case, Judge Kivett was careful to point out to the jury that he was not "attempting to rush you in any way or to try to dictate to you what you should or should not do. . . ." In light of this cautionary language, we do not feel that this instruction improperly coerced the jury.

Defendant also challenges an instruction the trial judge gave the jury after bringing them into the courtroom at 9:55 p.m. to inquire whether they felt they were making any progress. Upon being told that they were "sort of hung up," Judge Kivett instructed in part:

These matters are mentioned now because some of them may not have been in your thoughts. This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion or opinions of other jurors or because of the importance of arriving at a decision. This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candidness. If at all possible, you should resolve any differences and come to a common conclusion so that this case may be completed.

You may be as leisurely in your deliberations as the occasion may require and take all the time that you feel necessary. The giving of this instruction at this time in no way means it is more important than any other instructions. On the contrary, you should consider this instruction together with and as a part of the instructions which I previously gave you.

[4] Defendant contends that the jury was improperly coerced by that portion of the charge in which the court instructed, "If at all possible, you should resolve any differences and come to a common conclusion so that this case may be completed." We disagree. In *State v. McKissick*, 268 N.C. 411, 150 S.E. 2d 767 (1966), Chief Justice Parker quoted with approval from 89 C.J.S., Trial, § 481, p. 128:

> What amounts to improper coercion of a verdict by a trial court necessarily depends to a great extent on the facts and circumstances of the particular case and cannot be determined by any general or definite rule. . . . In urging the jury to agree on a verdict, the court should emphasize that it is not endeavoring to inject its ideas into the minds of the jurors and that by such instruction the court does not intend that any juror should surrender his own free will and judgment, and these ideas should be couched in language readily understood by the ordinary lay juror.

In instant case, the court did emphasize that it was not endeavoring to inject its ideas into the minds of the jurors and expressly stated the language approved in *McKissick* to the effect that no juror "should surrender their honest convictions."

A contextual reading of the charge discloses that the trial judge did not improperly coerce the jury to return a verdict.

No error.