THE STATE OF OHIO, APPELLANT, *v.* ROBERTS, APPELLEE.

[Cite as State *v.* Roberts (1987), 32 Ohio St. 3d 225.]

(No. 86-779—Decided September 2, 1987.)

*Oglesby & Oglesby* and *Geoffrey L. Oglesby,* for appellee.

HERBERT R. BROWN, J. In *Miranda* v. *Arizona* (1966), 384 U.S. 436, 478, 479, the United States Supreme Court held:

"* * * [T]hat when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."

The *Miranda* holding was premised upon the proposition that "* * * the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467. The

*John A. Pfefferle,* prosecuting attorney, *Ronald R. Smith* and *Robert M. Moore,* for appellant.

court reasoned that "* * * [u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Id.* at 458. Thus, a statement obtained during a custodial interrogation,[1] in the absence of the requisite warnings, is considered a product of coercive influences and "compelled" within the meaning of the Fifth Amendment to the United States Constitution.[2] *Id.* at 460-462.

In the case *sub judice,* Roberts was in custody at the time he made incriminating statements to his probation officer. See *State* v. *Buchholz* (1984), 11 Ohio St. 3d 24, 26, 11 OBR 56, 58, 462 N.E. 2d 1222, 1225; *Berkemer* v. *McCarty* (1984), 468 U.S. 420; *Oregon* v. *Mathiason* (1977), 429 U.S. 492. Hence, the primary issue is whether statements made by an in-custody probationer to his probation officer, without prior *Miranda* warnings, are admissible in a subsequent criminal proceeding. This is a question of first impression in Ohio.

---

## I

The United States Supreme Court has not addressed the precise issue; however, in *Minnesota* v. *Murphy* (1984), 465 U.S. 420, the court held that a statement obtained by a probation officer in a *noncustodial* setting could be introduced against a probationer in a subsequent criminal prosecution.[3] The court found that the coercion inherent in custodial interrogation is not present in a *pre-arranged, routine* probation interview. The court stressed the custody requirement of *Miranda:*

"We emphasize that Murphy was not under arrest and that he was free to leave at the end of the meeting. *A different question would be presented if he had been interviewed by his probation officer while being held in police custody or by the police themselves in a custodial setting.*" (Emphasis added.) *Id.* at 429, fn. 5.

The decisions in other jurisdictions are in conflict. Most of these cases turn on whether a probation officer is a "law enforcement officer" under *Miranda.*[4]

---

[1] The court defined "custodial interrogation" as "* * * questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona, supra,* at 444.

[2] The Self-Incrimination Clause provides: "No person * * * shall be compelled in any criminal case to be a witness against himself * * *." Fifth Amendment to the United States Constitution. The *Miranda* court found that a pre-trial custodial interrogation was an extension of the criminal case. *Id.* at 467. The self-incrimination privilege is applicable to state proceedings by virtue of the Fourteenth Amendment. *Malloy* v. *Hogan* (1964), 378 U.S. 1. The privilege against self-incrimination has an independent basis as found in Section 10,

Article I of the Ohio Constitution, which provides in pertinent part:

"No person shall be compelled, in any criminal case, to be a witness against himself * * *."

[3] In *Minnesota* v. *Murphy, supra,* the respondent's probation officer received information from a treatment counselor that respondent, during the course of treatment, admitted to commission of a previous rape and murder. The probation officer wrote to respondent requesting that he contact her to discuss a treatment plan for the remainder of his probationary period. Respondent met with his probation officer in her office, and in response to questioning confessed that he committed the rape and murder.

[4] See, generally, Comments, Probation

In *People* v. *Ronald W.* (1969), 24 N.Y. 2d 732, 302 N.Y. Supp. 2d 260, 249 N.E. 2d 882, the court determined that although "* * * a probation officer is a 'peace officer' * * * he is not a 'law enforcement' officer within the spirit or meaning of *Miranda* v. *Arizona, supra.*" *Id.* at 735, 302 N.Y. Supp. 2d at 262, 249 N.E. 2d at 884. The court reasoned: "* * * The clearly stated objectives of education and rehabilitation which are always paramount in the relationship between the probation officer and the probationer [citations omitted] are totally foreign to the elements the Supreme Court addressed itself to in *Miranda.*" *Id.* at 734-735, 302 N.Y. Supp. 2d at 262, 249 N.E. 2d at 883. Accord *State* v. *Johnson* (1972), 87 S.D. 43, 202 N.W. 2d 132; *State* v. *Jackson* (1972), 16 Ariz. App. 476, 494 P. 2d 376.[5] See, also, *Nettles* v. *State* (Fla. App. 1971), 248 So. 2d 259.

In contrast, the United States District Court for the Western District of Pennsylvania has held that *Miranda* warnings must be given by a parole or probation officer, to a defendant in custody, in order to admit the statements made by the defendant. *United States* v. *Steele* (W.D. Pa. 1976),

419 F. Supp. 1385, 1386-1387. In *Steele,* the defendant was placed in the custody of his probation officer, after a preliminary hearing on a gun charge, pursuant to a forty-eight hour detainer placed against him for probation violation. During the process of transporting defendant to the county jail, the probation officer questioned him about the circumstances of his arrest without informing him of his *Miranda* rights.

In *State* v. *Magby* (1976), 113 Ariz. 345, 554 P. 2d 1272, the defendant-probationer was arrested as a suspect in connection with a fatal shooting incident. Two days after his incarceration, defendant's probation officer visited him in jail and, without prior *Miranda* warnings, questioned him about the shooting. The Supreme Court of Arizona held that in-custody statements regarding a new offense, elicited without *Miranda* warnings by a probation officer, should not be admissible.[6] *Id.* at 349, 554 P. 2d at 1276. The court stressed the psychological pressure inherent in an in-custody interview between a probation officer and the probationer. *Id.* Accord *Marrs* v. *State* (1982), 53 Md. App. 230, 452 A. 2d 992. See, also, *State* v. *Lekas* (1968), 201 Kan. 579, 442 P. 2d 11.[7]

---

Officer Interrogation of an In-Custody Probationer: An Analysis of the Applicability of the *Miranda* Doctrine and the Voluntariness Standard (1976), 10 U.S.F. L. Rev. 441; Note, *State* v. *Magby:* Application of the *Miranda* Doctrine to In-Custody Probationers (1977), 7 Cap. U. L. Rev. 103.

[5] The courts in *People* v. *Ronald W., supra,* and *State* v. *Johnson, supra,* also determined that each defendant was *not* in custody. That finding influenced the result in each of those cases.

[6] Although the court in *State* v. *Magby, supra,* noted that admission of the probationer's statements to his probation officer

was error, the court held the error harmless since the defendant's guilt was "overwhelmingly established by other evidence and [the error] did not contribute to the verdict." *Id.* at 353, 554 P. 2d at 1280.

[7] In *State* v. *Lekas, supra,* the Supreme Court of Kansas found a *Miranda* obligation primarily because it considered parole officers and probation officers to be law enforcement officers under a Kansas statute.

In Ohio, R.C. 2901.01(K) provides:

" 'Law enforcement officer' means any of the following:

"* * *

"(2) An *officer,* agent, or employee *of the state* or any of its agencies, instrumen-

## II

This court addressed the admissibility of statements obtained by a *parole officer* without first advising the in-custody parolee of his constitutional rights in *State* v. *Gallagher* (1974), 38 Ohio St. 2d 291, 67 O.O. 2d 354, 313 N.E. 2d 396, vacated (1976), 425 U.S. 257, on remand (1976), 46 Ohio St. 2d 225, 75 O.O. 2d 280, 348 N.E. 2d 336. In *Gallagher,* we followed *United States* v. *Deaton* (C.A. 5, 1972), 468 F. 2d 541, 544, certiorari denied (1973), 410 U.S. 934. We held:

"Testimony as to utterances made by an accused to his parole officer is inadmissible at trial where the utterances were in response to questions by the parole officer, and, prior to the questioning, the parole officer failed to advise the accused of his right to remain silent, of his right to be provided with counsel prior to questioning, and warn him that any utterance may be used as evidence against him." *Gallagher, supra* (38 Ohio St. 2d), at syllabus.

This court has also recognized "* * * that a probationer, like the parolee in *Gallagher,* must be afforded the right to assert his or her constitutional privileges." *State* v. *Burkholder* (1984), 12 Ohio St. 3d 205, 207, 12 OBR 269, 271, 466 N.E. 2d 176, 179, certiorari denied (1984), 469 U.S. 1062. (Holding in the syllabus that "evidence obtained through an unreasonable or unlawful search and seizure is inadmissible in a probation revocation proceeding.")[8] Just as we have found no material difference between probationers and parolees in the context of constitutional guarantees, we find that for purposes of adherence to the *Miranda* doctrine, there is no significant basis for differentiating between probation and parole officers.[9] Cf. *State* v. *Gallagher, supra.*

---

talities, or political subdivisions, *upon whom, by statute, a duty* to conserve the peace or *to enforce all* or certain *laws is imposed and* the *authority to arrest violators is conferred, within the limits of such statutory duty and authority*; * * *." (Emphasis added.)

R.C. 2951.08 provides in part:

"During a period of probation, any field officer or probation officer may arrest the defendant without a warrant and bring him before the judge or magistrate before whom the cause was pending. * * *"

[8] The court in *Minnesota* v. *Murphy, supra,* stated that the privilege against self-incrimination "* * * not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' * * * [citations omitted]." *Id.* at 426. The court also stated:

"A defendant does not lose this protection by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned *or on probation* at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." (Emphasis added.) *Id.*

[9] Custodial interrogation is not limited to police stationhouse interrogation. See *Mathis* v. *United States* (1968), 391 U.S. 1; *Orozco* v. *Texas* (1969), 394 U.S. 324. Neither is Fifth Amendment protection limited to any single source of official interrogation. Where a defendant is subject to the inherently compelling pressures of a custodial situation, he is entitled to warning before *any* official interrogation. *Estelle* v. *Smith* (1981), 451 U.S. 454, 467. The official interrogators were corrections officers in *Whitfield* v. *State* (1980), 287 Md. 124, 411 A. 2d 415, certiorari dismissed (1980), 446 U.S. 993; an agent of the Internal Revenue Service in *Mathis* v. *United States, supra;* a court-designated psychiatrist, *Estelle* v. *Smith, supra;* and a prose-

The Maryland Court of Special Appeals, in *Marrs* v. *State, supra,* has stated the rationale which supports our holding: "* * * It seems to us that an accused, whose essential obligation it is to 'report to' and 'answer questions posed by a probation officer,' *United States* v. *Rea,* 678 F. 2d 382 (2d Cir. 1982), is under even heavier psychological pressure to answer questions put by his probation officer, a figure of both authority and trust. A probationer, who often talks to his supervising officer as a counselor and confidante, might very well assume that any statements made by him are in some way confidential thus bringing into play the mandates of *Miranda.* * * *" 53 Md. App. at 233, 452 A. 2d at 993-994.

Further, we note the deceptive effect engendered by the in-custody questioning of a probationer by his probation officer. Justice Thurgood Marshall, dissenting in *Murphy, supra,* emphasized the potential abuse of the probationer-probation officer relationship:

"* * * It is true, as the majority points out, that the discussion between a probation officer and a probationer is likely to be less coercive and intimidating than a discussion between a police officer and a suspect in custody. *Ante,* at 433. But it is precisely in that fact that the danger lies. In contrast to the inherently adversarial relationship between a suspect and a policeman, the relationship between a probationer and the officer to whom he reports is likely to incorporate elements of confidentiality, even friendship. Indeed, many probation officers deliberately cultivate such bonds with their charges. The point should not be overstated; undoubtedly, few probationers are entirely blind to the fact that their probation officers are 'peace officer[s], . . . allied, to a greater or lesser extent, with [their] fellow peace officers.' *Fare* v. *Michael C.,* 442 U.S. 707, 720 (1979). On the other hand, many probationers develop 'relationship[s] of trust and cooperation' with their officers. *Id.,* at 722. Through abuse of that trust, a probation officer can elicit admissions from a probationer that the probationer would be unlikely to make to a hostile police interrogator." (Footnotes omitted.) 465 U.S. at 459-460.

The circumstances in the present case demonstrate the danger. First, the call to Fuqua was made shortly after the defendant was taken to the county jail. For what purpose was that call made? Was it not that Fuqua would be able to elicit information from Roberts? Fuqua met with Roberts in a "holding area" which is enclosed behind a security door, and no one else was present. In this atmosphere of privacy, Fuqua could exploit his relationship with Roberts. It is not clear from the record who initiated the conversation, but it can be inferred that Fuqua knew his conduct and words were "reasonably likely to elicit an incriminating response from [Roberts]."[10] *Rhode Island* v. *Innis* (1980), 446 U.S. 291, 301.[11]

---

cuting attorney in *People* v. *Arnold* (1967), 66 Cal. 2d 438, 58 Cal. Rptr. 115, 426 P. 2d 515.

[10] The Ninth Circuit Court of Appeals, in describing the law enforcement aspects of the Federal Probation Act, encouraged mutually beneficial cooperation between law enforcement and probation departments but stated, "* * * under no circumstances should cooperation between law enforcement officers and probation officers be permitted to make the probation system 'a subterfuge for criminal investigations.' " (Citation omitted.) *United States* v. *Consuelo-Gonzalez* (C.A. 9, 1975), 521 F. 2d 259, 267.

[11] In *Rhode Island,* the United States Supreme Court stated:

Finally, Fuqua recorded Roberts' comments in an investigative workbook. However, these statements were not written in Roberts' presence nor was he aware that Fuqua would write them down. The appearance of deception is evident. The result is precisely that which the court in *Miranda* sought to prevent.[12]

We are persuaded that the better rule is followed in those jurisdictions which require a probation officer to give *Miranda* warnings prior to questioning an *in-custody* probationer. Accordingly, we hold that statements by an in-custody probationer to his probation officer are inadmissible in a subsequent criminal trial, where prior to questioning, the probation officer failed to advise the probationer of his *Miranda* rights as required by Section 10, Article I of the Ohio Constitution and by the Fifth and Fourteenth Amendments to the United States Constitution.

### III

Even if the conversation between the defendant and Fuqua falls within the scope of *Miranda*, the state argues that the warning given to the defendant at the time of his arrest is sufficient for constitutional and *Miranda* purposes. No new warning, the state maintains, was necessary at the time probation officer Fuqua engaged the defendant in conversation.[13]

The standard by which we

---

"* * * [T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) *that the police should know are reasonably likely to elicit an incriminating response* from the suspect." (Emphasis added.) *Id.*

[12] In *Miranda* the court noted:

"* * * We are satisfied that all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." (Footnote omitted.) 384 U.S. at 461.

[13] See, *e.g.*, *United States, ex rel. Patton*, v. *Thieret* (C.A. 7, 1986), 791 F. 2d 543, certiorari denied (1986), 479 U.S. ___, 93 L. Ed. 2d 259 (*Miranda* warnings given and defendant detained in holding cell for approximately forty minutes before making oral statement); *Stumes* v. *Solem* (C.A. 8, 1985), 752 F. 2d 317, certiorari denied (1985), 471 U.S. 1067 (interview came nearly six and one-half hours after *Miranda* rights given); *Jarrell* v. *Balkcom* (C.A. 11, 1984), 735 F. 2d 1242, certiorari denied (1985), 471 U.S. 1103, rehearing denied (1985), 473 U.S. 921 (confession made less than four hours after issuance of *Miranda* warnings); *United States, ex rel. Henne*, v. *Fike* (C.A. 7, 1977), 563 F. 2d 809, certiorari denied (1978), 434 U.S. 1072 (nine hours between *Miranda* warnings and waiver of new warnings); *State* v. *Noriega* (1984), 142 Ariz. 474, 690 P. 2d 775 (statement made at second interrogation two hours after initially receiving *Miranda* warnings); *Bush* v. *State* (Fla. 1984), 461 So. 2d 936, certiorari denied (1986), 475 U.S. ___, 89 L. Ed. 2d 345 (confession given eleven hours after *Miranda* warning). See, also, *United States* v. *Hopkins* (C.A. 5, 1970), 433 F. 2d 1041, certiorari denied (1971), 401 U.S. 1013 (no new warnings required where change from state police officer questioning defendant about state crime to federal officer questioning about federal crime); *Commonwealth* v. *Bradley* (1972), 449 Pa. 19, 295 A. 2d 842 (confession at stationhouse without warn-

measure this argument is set forth in *State* v. *Burge* (1985), 195 Conn. 232, 487 A. 2d 532, wherein the Supreme Court of Connecticut stated:

"Early *Miranda* warnings may be constitutionally sufficient if they precede interrogation that directly produces information so immediately incriminating that the defendant's status within a relatively brief period of time becomes that of a suspect in custody. *The test is whether the warnings given are, in light of the particular facts and the totality of the circumstances, sufficiently proximate in time and place to custodial status to serve as protection 'from the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation.' Berkemer* v. *McCarty*, supra, 3145; see *Jarrell* v. *Balkcom*, 735 F. 2d 1242, 1253-54, reh. denied, 740 F. 2d 979 (11th Cir. 1984); *State* v. *Mitchell*, 104 Idaho 493, 496-97, 660 P. 2d 1336, cert. denied, 461 U.S. 934, 103 S. Ct. 2101, 77 L. Ed. 2d 308 (1983); *Edwards* v. *State*, 274 Ind. 387, 391, 412 N.E. 2d 223 (1980); *People* v. *O'Donnell*, 127 Mich. App. 749, 339 N.W. 2d 540 (1983). We recognize that precustodial warnings may fail to provide the necessary protection if the overall situation becomes significantly more coercive as a result of a change to custodial status or if, because of a significant lapse in the process of interrogation, the warnings have become so stale as to dilute their effectiveness. Cf. *United States* v. *Paulton*, 540 F. 2d 886, 890-91 (1976); *Grimes* v. *State*, 454 N.E. 2d 388 (Ind. 1983); *State* v. *Gilbert*, 98 N.M. 530, 650 P. 2d 814 (1982), * * *; *State* v. *McZorn*, 288 N.C. 417, 433-34, 219 S.E. 2d 201 (1975), death sentence

vacated, 428 U.S. 904, 96 S. Ct. 3210, 49 L. Ed. 2d 1210 (1976); Ringel, Searches, Seizures, Arrests and Confessions (1984) § 26.3(c)." (Emphasis added.) *Id.* at 248-249, 487 A. 2d at 543.

The totality of the circumstances test is explained by the Supreme Court of North Carolina in *State* v. *McZorn* (1975), 288 N.C. 417, 219 S.E. 2d 201. The following criteria are set forth:

"* * * (1) [T]he length of time between the giving of the first warnings and subsequent interrogation, * * * (2) whether the warnings and the subsequent interrogation were given in the same or different places, * * * (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers, * * * (4) the extent to which the subsequent statement differed from any previous statements; * * * [and] (5) the apparent intellectual and emotional state of the suspect. * * *" (Citations omitted.) *Id.* at 434, 219 S.E. 2d at 212. See, also, *State* v. *Myers* (Me. 1975), 345 A. 2d 500; *State* v. *Artis* (1981), 304 N.C. 378, 283 S.E. 2d 522.

Applying these standards to the case *sub judice*, we note that Roberts was given warnings at the time of arrest (approximately two hours prior to talking to Fuqua), and that the record does not establish whether those warnings were given in the context of interrogation. Second, the prior warnings were given at Roberts' girlfriend's home while the subsequent interrogation took place at the county jail. Third, the warnings were given by police officers, whereas the interrogation was conducted by a probation of-

---

ings less than one hour after warnings in squad car by different officers valid). See, generally, 1 Lafave & Israel, Criminal Procedure (1984) 520, Section 6.8.

ficer (having a prior relationship with the defendant Roberts). Thus, the warnings given at the time of arrest fail on the criteria necessary to satisfy the totality-of-circumstances test.

## IV

Finally, we reject the appellant's contention that Roberts' failure to file a pre-trial motion to suppress his probation officer's testimony pursuant to Crim. R. 12(B)(3) constituted a waiver of his right to object to its admission. Crim. R. 12(G) provides that "[f]ailure by the defendant to raise defenses or objections * * * which must be made prior to trial, * * * pursuant to subdivision (C), * * * shall constitute waiver thereof, *but the court for good cause shown may grant relief from the waiver.*" (Emphasis added.) Roberts' counsel did not receive notice from appellant that Fuqua was a potential witness or learn of the damaging nature of Fuqua's testimony until the first day of trial. Appellee was not afforded a reasonable opportunity to comply with Crim. R. 12(C).

Further, it was unnecessary for the appellate court to reach the issue of plain error. The parties stipulated that the record should have reflected an objection during trial to the testimony of Fuqua and appellant conceded, in argument before this court, that an objection was made.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

SWEENEY, LOCHER and WRIGHT, JJ., concur.

MOYER, C.J., HOLMES and DOUGLAS, JJ., dissent.

HOLMES, J., dissenting. This case should have announced the overruling of the broad syllabus language in *State*

v. *Gallagher* (1974), 38 Ohio St. 3d 291, 67 O.O. 2d 354, 313 N.E. 2d 396, vacated and remanded (1976), 425 U.S. 257, clarified and reinstated (1976), 46 Ohio St. 2d 225, 75 O.O. 2d 280, 348 N.E. 2d 336, upon authority of *Minnesota* v. *Murphy* (1984), 465 U.S. 420. Moreover, statements by the criminal defendant in this case were freely and voluntarily given, and were not the product of a compelled interrogation. Because I cannot acquiesce in this broad grant of privileges and immunities to criminal defendants which go well beyond the requirements of the Constitution or *Miranda* v. *Arizona* (1966), 384 U.S. 436, 36 O.O. 2d 237, and its progeny, I must dissent.

The Fifth Amendment to the United States Constitution provides that no one "shall be *compelled* in any criminal case to be a witness against himself." (Emphasis added.) *Miranda* v. *Arizona* was established to secure this privilege against compulsory or involuntary self-incrimination. *Michigan* v. *Tucker* (1974), 417 U.S. 433, 438-439. Such rule would ordinarily be violated any time the conduct of law enforcement officers was such as to overbear the will to resist and bring about a confession not freely self-determined. See, *e.g., Garner* v. *United States* (1976), 424 U.S. 648. Moreover, the United States Supreme Court has "consistently held * * * that this extraordinary safeguard 'does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.' *Roberts* v. *United States* [(1980), 445 U.S. 552], *supra*, at 560." *Murphy, supra*, at 430. It is axiomatic that analysis is not based upon application of simplistic *per se* rules, but instead "[t]he question whether a confession is the product of a free will * * * must be answered on the facts of each case." *Brown* v. *Illinois* (1975), 422 U.S. 590, 603.

The principles which ought to guide the court's inquiry are set forth in *Minnesota* v. *Murphy, supra,* wherein a confession given by the criminal defendant to his probation officer was found to be admissible evidence. While there was no arrest therein by law enforcement officials, the United States Supreme Court nevertheless characterized custodial interrogations as conducted by law enforcement "officers who are 'acutely aware of the potentially incriminatory nature of the disclosures sought,' *Garner* v. *United States,* 424 U.S., at 657 * * *." *Murphy,* at 430. An illegally coercive environment was described as containing " 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' *Miranda* v. *Arizona,* 384 U.S., at 467. See *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 246-247 (1973)." *Id.* It is the " 'overbearing compulsion * * * caused by isolation of a suspect in police custody' " (*Murphy, supra,* at 430) and the " 'interrogation environment * * * created for no purpose other than to subjugate the individual to the will of his examiner,' " (*id.* at 433) which may create a violation of *Miranda.* "* * * Finally, the coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained. [Quoting *Miranda, supra,* at 457.] * * * [The suspect] is painfully aware that he cannot escape a persistent custodial interrogator." *Id.* at 433.

Instead of applying the above well-accepted principles, the majority assumes that because there was an arrest of the criminal defendant here, custodial interrogation, characterized by compulsion, created the confession

at issue. In support of their *per se* rule against a particular class of voluntary confessions, and also to distinguish the present case from *Murphy, supra,* the majority relies upon footnote five of *Murphy* which, in essence, states that "[a] different question would be presented" if the kind of interrogation present in *Murphy* occurred while that criminal defendant was in police custody. In *Murphy,* it was admitted that the probation officer sought to question the defendant for the express purpose of obtaining evidence for use by police and prosecution. She asked direct inculpatory questions and reported the answers to police. By failing to distinguish the interrogation in *Murphy* from the case before this court, the majority implies a *per se* rule that all questioning which follows an arrest is necessarily custodial interrogation. This has never been the rule.

The issue in the present case, as in *Murphy, supra,* is whether the statements to the probation officer were compelled or involuntary. This is the heart of *Miranda,* and the Fifth Amendment. The Fifth Amendment is not self-executing. Where no compulsion is present, it is up to the self-incriminator to assert his own privilege. If compulsion is present, then *Miranda* warnings must be given. *Murphy, supra,* at 425.

In the present case, it is clear that there was no interrogative setting. Admittedly, the defendant had been arrested and was in custody. However, he was in an outer processing area and had not been subjected to any interview. As in *Murphy,* the criminal defendant here was not required to provide incriminating statements to the probation officer, and was free to refuse to talk to him. Not only was there sufficient freedom and room for this defendant to walk away from the probation officer, the defendant may

reasonably have ordered him out of his presence since the probation officer was there only by permission. Also, there was no isolation or coercion. This could hardly be construed as an environment which would create "* * * inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not do so freely." *Miranda, supra,* at 467, 36 O.O. 2d at 252.

Instead, the record indicates that the probation officer walked into the processing area and initiated a conversation with the criminal defendant. The record does not show that any incriminating questions were asked, but that, based upon their prior relationship, the defendant voluntarily confided to the probation officer not only the circumstances of his arrest but also that his girlfriend was willing to be convicted in order to save him from an enhanced sentence. Not only were such statements freely and voluntarily given, but there also appears to have been no threat of probation revocation, cf. *Murphy, supra,* at 423-424 and 437, or intent to evoke incriminating answers, as was present in *Murphy.* Furthermore, while the criminal defendant in *Murphy* received no *Miranda* warnings whatsoever, here the defendant was expressly given such warnings at the time of his arrest.

What is quite clearly overlooked by the majority is that the probation officer testified that he had no intention whatsoever of acquiring incriminatory statements for prosecutorial purposes. He agreed that he considered the relationship between himself and the defendant here to be one of confidentiality and that he personally had never broken that confidence or taken any such information to the prosecution. Apparently, this was his general view as to all parolees under his administra-

tion. Finally, he testified that the revelations of defendant's statements were made in court pursuant to subpoena and that the statements themselves were made in a public area where anyone could have overheard them.

It has been accepted law for some time that incarcerated persons need not receive *Miranda* warnings prior to conversations with those who are not law enforcement officers when arrest has already taken place so long as there is no environment of coercive interrogation. Resultant inculpatory statements are considered voluntary and not the result of compulsion. See, *e.g., State* v. *McDonald* (La. 1980), 387 So. 2d 1116, certiorari denied (1980), 449 U.S. 957 (cellmate who acted as agent for police); *State* v. *Holcomb* (1978), 295 N.C. 608, 247 S.E. 2d 888 (uncle asks about murder weapon); *State* v. *Red Paint* (N.D. 1981), 311 N.W. 2d 182 (juvenile home executive director inquires about involvement in two murders); *Brown* v. *State* (Miss. 1974), 293 So. 2d 425, certiorari denied (1974), 419 U.S. 1001 (murder victim's mother inquires as to motive); *People* v. *Parker* (1979), 101 Misc. 2d 800, 421 N.Y. Supp. 2d 561 (statements to parole officer concerning possession of weapon); *State* v. *Fletcher* (1971), 279 N.C. 85, 181 S.E. 2d 405 (robbery victim inquires as to motive).

It is not reasonable to conclude that an Ohio probation officer is an enforcement officer as contemplated in *Miranda* and its progeny. Where a state statute provides that probation officers should exercise police powers to the same extent as other peace officers, then general enforcement powers are contemplated and failure to give *Miranda* warnings stands or falls upon the same standards applicable to police officers. See, *e.g., State* v. *Lekas*

(1968), 201 Kan. 579, 442 P. 2d 11, where such occurred.

In Ohio, by contrast, parole officers have no general grant either of investigative or enforcement powers. They may arrest only for parole violations as distinguished from criminal conduct and investigations. This limited power did not convert the parole officer in *Murphy* into a law enforcement officer any more than it did in the present case.

In spite of the existence of a myriad of cases holding to the contrary, the majority asserts the view that such in-custody questioning has a "deceptive effect" because the probation officer is "a figure of both authority and trust." The essence of this view was propounded by the dissent in *Murphy, supra,* at 459-460. Such view was flatly rejected by the majority which stated that the very fact of familiarity between the two serves to insulate the defendant "from the psychological intimidation that might overbear his desire to claim the privilege." *Id.* at 433.

Even though it could reasonably be concluded that the probation officer could be classified as an enforcement officer, and that the interview by such officer with the defendant could be considered as a custodial interrogation, the defendant's constitutional right to remain silent was not violated.

Here the defendant had been advised of his *Miranda* rights at the time of his arrest approximately one and one-half hours prior to the discussion with the probation officer. In applying the "in light of the particular facts and the totality of the circumstances" test as set forth in *State* v. *Burge* (1985), 195 Conn. 232, 248, 487 A. 2d 532, 543, to the facts of this case, this court should find that the defendant had received an adequate admonition of his constitutional rights so that his statements made to the probation officer were admissible whether they were made voluntarily or involuntarily.

Finding nothing to indicate that the defendant's statement was involuntary, and because the majority has apparently refused to follow the sound legal precedent established in *Minnesota* v. *Murphy,* and finding that in any event the *Miranda* warnings were sufficient in time to meet the tests set forth by the United States Supreme Court, I must dissent.

DOUGLAS, J., dissenting. In *Miranda* v. *Arizona* (1966), 384 U.S. 436, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, *stemming from custodial interrogation of the defendant* unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (Emphasis added.) *Id.* at 444. Because I believe that the statements at issue in this case were not the result of an "interrogation" and thus were properly admitted, I respectfully dissent.

In *Rhode Island* v. *Innis* (1980), 446 U.S. 291, the United States Supreme Court considered the question of what constitutes "interrogation" for purposes of determining whether *Miranda* protections are triggered. The *Innis* court recognized that "interrogation" is not limited to express questioning. *Id.* at 298-299. However, the term does not embrace any and all statements or conduct of police in the presence of a defendant in custody. " 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300. The court concluded that "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under

*Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 300-301.

The record in the case at bar indicates that appellee's probation officer, Larry Fuqua, arrived at the county jail after appellee's arrest to obtain a copy of the arrest report. There he encountered appellee, who was waiting to be "processed" on the charges for which he had been arrested. At that point, according to Fuqua's testimony, "[a] conversation developed between the two of us," during which appellee made several inculpatory statements. Nowhere in the record is it suggested that these statements were made in reaction to either express questioning by Fuqua or other conduct which Fuqua should have known was reasonably likely to elicit an incriminating response. Thus, it cannot be said that any "interrogation" occurred during that conversation, and the fact that Fuqua did not warn appellee of his *Miranda* rights does not affect the admissibility of the statements in question.

*State* v. *Gallagher* (1974), 38 Ohio St. 2d 291, 67 O.O. 2d 354, 313 N.E. 2d 396, upon which the majority relies, is easily distinguishable from the case at bar. The syllabus of *Gallagher,* quoted in the majority opinion, renders inadmissible any statements made by an accused to his parole officer without prior *Miranda* warnings, where such statements were *"in response to questions by the parole officer * * *."* (Emphasis added.) As discussed above, there is absolutely no suggestion in the record that the statements in this case were in response to questions by the probation officer. The majority opinion merely assumes, without discussion or justification, that such questioning did in fact occur, and therefore repeatedly places mistaken reliance on case law in which questioning or other forms of interrogation took place.

Since the statements in question were not made in response to interrogation and thus do not trigger the admissibility requirements of *Miranda*, I would reverse the judgment of the court of appeals and reinstate appellee's convictions. The statements were properly admitted.

MOYER, C.J., concurs in the foregoing dissenting opinion.