[Cite as *State v. Cleland*, 2011-Ohio-6786.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| STATE OF OHIO | C.A. No. 09CA0070-M |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| SHAUN CLELAND | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No. 05CR0492 |

DECISION AND JOURNAL ENTRY

Dated: December 30, 2011

CARR, Judge.

{¶1} Appellant, Shaun Cleland, appeals his conviction and sentence in the Medina County Court of Common Pleas. This Court affirms, in part, and reverses, in part.

I.

{¶2} When Christina Eichelberger got home from work just after midnight on October 2, 2005, she found her roommate and boyfriend, David Heinricht, unconscious with a noose around his neck and a typed suicide note in his hand. Ms. Eichelberger asked a neighbor to call 911 and returned to her apartment, where she performed CPR on Mr. Heinricht after cutting the noose. Despite her efforts, and the efforts of the first responders, Mr. Heinricht could not be revived. Police investigators quickly concluded that the scene had been staged and that Mr. Heinricht had been the victim of foul play. Upon Ms. Eichelberger's suggestion that Cleland, her estranged husband, might be

involved, police arrested him at Cleveland Hopkins International Airport. Cleland soon confessed that he strangled Mr. Heinricht.

{¶3} Cleland was indicted on one count of aggravated murder in violation of R.C. 2903.01(A); two counts of aggravated murder in violation of R.C. 2903.01(B); one count of murder in violation of 2903.02(A); two counts of murder in violation of R.C. 2903.02(B); one count of aggravated burglary in violation of R.C. 2911.11(A)(1); and one count of kidnapping in violation of R.C. 2905.01(A)(3). Before trial, Cleland moved to suppress the statements that he made to police, arguing that under the circumstances of this case, a single *Miranda* warning was not sufficient. The trial court denied the motion to suppress, and the matter proceeded to a jury trial. The jury found Cleland guilty on all of the charges. The trial court merged counts one through five for purposes of sentencing and sentenced Cleland to life imprisonment with the possibility of parole after thirty years on count one. The trial court also sentenced him to concurrent five-year sentences for the convictions of aggravated burglary and kidnapping, but ordered the five-year prison term to be served consecutively with the term imposed for count one. Cleland timely appealed, raising five assignments of error which this Court has rearranged to facilitate disposition.

## II.

### ASSIGNMENT OF ERROR I

"THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION TO SUPPRESS, WHERE THE POLICE FAILED TO RE-ADVISE HIM OF HIS *MIRANDA* RIGHTS PRIOR TO RESUMPTION OF THE CUSTODIAL INTERROGATION AND WHERE THE ALLEGED WAIVER OF THOSE MIRANDA RIGHTS AND THE ALLEGED CONFESSION WAS

INVOLUNTARY, IN VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL RIGHTS UNDER THE U.S. AND OHIO CONSTITUTIONS."

{¶4} Cleland's first assignment of error is that the trial court should have suppressed the statements that he made to police officers after his first interview because his statements were not voluntarily made and because the investigating officer did not provide *Miranda* warnings before interviewing him again. We disagree.

{¶5} Because our review of a motion to suppress involves issues of law and fact, this Court accepts a trial court's findings of fact if supported by competent, credible evidence, but reviews the trial court's legal conclusions de novo. See *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶8. Whether a confession is obtained voluntarily is determined by a two-part analysis. Because the key element in constitutional violations is state action, the first consideration is whether the police used inherently coercive tactics in the course of the interview. See *Colorado v. Connelly* (1986), 479 U.S. 157, 166. In other words, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167.

{¶6} If there is evidence that police used inherently coercive interrogation tactics, courts evaluate the totality of the circumstances surrounding the interrogation to determine whether the defendant confessed voluntarily. *State v. Treesh* (2001), 90 Ohio St.3d 460, 472. "Evidence of use by the interrogators of an inherently coercive tactic (e.g., physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger the totality of the circumstances analysis. Accordingly, we need not assess the totality of

the circumstances unless we find that the tactics used by the detectives were coercive." (Internal citations omitted.) Id., citing *State v. Clark* (1988), 38 Ohio St.3d 252, 261.

{¶7} We note that our review of the trial court decision regarding Cleland's motion to suppress does not encompass the evidence that was adduced at trial after the fact. Consequently, to the extent that Cleland's arguments refer to evidence in the trial record, those arguments are not well taken. With respect to the voluntariness of Cleland's statements, the trial court concluded that "[a]t no time during these interactions with police officers was Cleland threatened, or deprived of food, drink, or use of restroom facilities." This finding is supported by clear and convincing evidence in the record, which contains no indication that inherently coercive tactics were used in the course of Cleland's interrogation. In the absence of such tactics, we need not evaluate the totality of the circumstances with respect to Cleland's state of mind. See *Treesh*, 90 Ohio St.3d at 472.

{¶8} Cleland has also argued that his statements during the second interrogation on the morning of October 2nd should be suppressed because the *Miranda* warnings administered before the first interrogation had grown stale at that point. When a suspect is given adequate *Miranda* warnings before a custodial interrogation, further warnings are not required before additional interrogation occurs. Id. at 470, citing *Wyrick v. Fields* (1982), 459 U.S. 42, 48-49, and *State v. Barnes* (1986), 25 Ohio St.3d 203, 208. "Police are not required to re-administer the *Miranda* warnings when a relatively short period of time has elapsed since the initial warnings. Courts look to the totality of the circumstances when deciding whether initial warnings remain effective for subsequent

interrogations." (Internal citations omitted.) *Treesh* at 470. In applying this test, courts consider the length of time between the *Miranda* warning and later interrogations; whether the suspect was interrogated in a different location or by different police officers; the extent to which the suspect's statements differ between interrogations; and the suspect's intellectual and emotional state. *State v. Roberts* (1987), 32 Ohio St.3d 225, 232, citing *State v. McZorn* (1975), 288 N.C. 417, 434. "*Miranda* warnings are sufficient if they are read within a sufficiently proximate time and place to the interrogation to insure that the suspect is protected from coercive pressures." *State v. Snow* (May 24, 2000), 9th Dist. No. 19742, citing *Roberts* at 232.

{¶9} As the trial court found, Detective Dean Weinhardt orally informed Cleland of his *Miranda* rights at the beginning of his first interview and, at approximately 6:00 a.m., Cleland executed a waiver of rights form that contained the same information in written form. At 6:48 a.m., Cleland executed another acknowledgement of his *Miranda* rights contained on the form onto which he reduced a confession to writing. Detective Weinhardt interviewed Cleland again at 9:12 a.m. He did not re-*Mirandize* Cleland then, but did ask whether he still understood his rights as they were explained earlier. The record from the suppression hearing differs from the trial court's findings of fact on this sequence of events. Specifically, the trial court incorrectly concluded that Cleland executed a written waiver of his *Miranda* rights and completed a written statement at the conclusion of the second interview. The record actually indicates that Cleland provided a written statement that contained a waiver of his *Miranda* rights at the conclusion of the

first interview, followed by a second interview that was not prefaced by a complete statement of his rights.

{¶10} Nonetheless, it was not error for the trial court to deny the motion to suppress. The second interview was conducted in the same location by the same investigating officer only two and one-half hours later. According to Detective Weinhardt's testimony, Cleland never asked for food or drink or complained about lack of sleep. Although Detective Weinhardt learned during the first interview that Cleland had consumed alcohol the previous evening, Cleland did not appear to be intoxicated or hampered in his ability to communicate. Some details of the second interview differ from the written statement that Cleland provided after the first, but the substance of his confession was materially consistent. Our consideration of the *Roberts* factors, therefore, leads to the conclusion that the initial *Miranda* warnings had not grown stale before the second interview.

{¶11} Cleland's first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

"THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED TO THE PREJUDICE OF DEFENDANT BY EXCLUDING, ON GROUNDS OF RELEVANCE, EVIDENCE AND TESTIMONY FAVORABLE AND POTENTIALLY EXCULPATORY TO THE DEFENDANT CONCERNING THE VICTIM'S PENDING FELONY DRUG CASE AND THE MYSTERIOUS VEHICLES SEEN IN THE VICINITY OF THE HOMES OF DEFENDANT'S SISTER AND MOTHER AT THE TIME OF THE HOMICIDE OFFENSE, WHICH EVIDENCE SUPPORTED DEFENDANT'S POSITION THAT ANOTHER UNIDENTIFIED MAN, WHO HAD THREATENED TO HARM HIS YOUNG NIECE IF DEFENDANT DID NOT TAKE BLAME FOR THE OFFENSE, ACTUALLY KILLED THE VICTM."

{¶12} Cleland's second assignment of error is that the trial court abused its discretion by determining that evidence offered by the defense was irrelevant and excluding it under Evid.R. 401 and 402. The trial court, however, did not exclude any evidence under Evid.R. 401 and 402, and so there is no error apparent from the record.

{¶13} According to Cleland, the trial court should have admitted police reports by his mother and sister about suspicious automobiles that were made soon after Mr. Heinricht's death. He maintains that this evidence was relevant to his own theory of the case, which is that an unidentified masked man actually killed Mr. Heinricht and threatened his own family if he did not confess. As far as can be determined from the record, however, no such police reports exist. It appears instead that Cleland has in mind police reports about suspicious vehicles that were made not by his family, but by Ms. Eichelberger and Mr. Heinricht's mother, Gloria Clancy. To the extent that he challenges the trial court's determination that this evidence was inadmissible, we note that the trial court's determination was actually that the content of the reports in the context of Detective Weinhardt's testimony would be hearsay, and we note that neither the State nor Cleland inquired about the reports when Ms. Eichelberger testified.

{¶14} Cleland has also argued that the trial court erred by excluding evidence of Mr. Heinricht's own criminal background. Again, however, the trial court did not do so. The record indicates that Cleland's attorney asked the coworker of Mr. Heinricht who drove him home on the night he died whether she was aware that Mr. Heinricht had "issues." At sidebar, Cleland's attorney explained that he meant whether she knew that he was living with a married woman. Nonetheless, the witness answered the question in

the negative; the State withdrew its objection; and the testimony moved forward without further elaboration and without a ruling from the Court.

{¶15} This Court has engaged in an exhaustive review of the voluminous trial record in this case and, simply put, the record does not substantiate the basis for Cleland's second assignment of error. As he has not argued any other trial court error with respect to the admission or exclusion of evidence, we decline to "create argument where none is made." *Deutsche Bank Natl. Trust Co. v. Taylor*, 9th Dist. No. 25281, 2011-Ohio-435, at ¶7, citing *Cardone v. Cardone* (May 6, 1998), 9th Dist. No. 18349. Cleland's second assignment of error is overruled.

### ASSIGNMENT OF ERROR IV

"THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE GUILTY VERDICTS AS TO ALL SEVEN COUNTS OF THE INDICTMENT, AND DEFENDANT'S CONVICTIONS FOR AGGRAVATED MURDER, AGGRAVATED BURGLARY, AND KIDNAPPING WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶16} Cleland's fourth assignment of error is that there is insufficient evidence supporting his convictions and that his convictions are against the manifest weight of the evidence. Specifically, with respect to each of his convictions, Cleland has argued that there is insufficient evidence that he was the perpetrator. He has also argued that the manifest weight of the evidence demonstrates that someone else killed David Heinricht. We disagree.

{¶17} "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. No. 24731, 2009–Ohio–6955, at ¶18, citing *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386. The

relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring). In reviewing the evidence, we do not evaluate credibility, and we make all reasonable inferences in favor of the State. *State v. Jenks* (1991), 61 Ohio St.3d 259, 273. The State's evidence is sufficient if it allows the trier of fact to reasonably conclude that the essential elements of the crime were proven beyond a reasonable doubt. Id.

{¶18} The identity of a perpetrator must be proved by the State beyond a reasonable doubt. *State v. Flynn*, 9th Dist. No. 06CA0096-M, 2007-Ohio-6210, at ¶12. As with any other element, identity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value. *State v. Gibson*, 9th Dist. No. 23881, 2008-Ohio-410, at ¶8.

{¶19} According to the testimony at trial, Cleland pursued reconciliation with Ms. Eichelberger persistently in the weeks before Mr. Heinricht's murder. She resisted his attempts. After he asked whether she was intimate with Mr. Heinricht and she responded in the affirmative, Cleland replied, "[t]hat's all I needed to know." Mr. Heinricht's employer received an anonymous call inquiring where Mr. Heinricht lived, and a male caller contacted the leasing office at Clearbrooke Apartments to find out who else was on Ms. Eichelberger's lease. Cleland booked a last-minute trip to Ohio, leaving him AWOL from his military base in Hawaii. Once in Ohio, Cleland found that he did not have a rental car reservation. According to the employee of Alamo Rental Car who dealt with Cleland that morning, his behavior was volatile. After he arrived in Ohio, Cleland

contacted Ms. Eichelberger, but left her with the impression that he was calling from Hawaii instead. He also purchased an air gun, BBs, a hunting knife, binoculars, and cigarettes.

{¶20} Cleland went to the apartment Ms. Eichelberger shared with Mr. Heinricht, leading Mr. Heinricht to contact the police. As Cleland admitted, he provided his own driver's license to the police officer who responded, but lied about his relationship to Ms. Eichelberger. When he left the apartment complex, Cleland drove to the bar where Ms. Eichelberger worked as a bartender. According to her testimony, Cleland told her that he had come to Ohio to convince her to return to Hawaii with him and was adamant that she would do so. Ms. Eichelberger testified that during their conversation, he asked whether she would reconcile with him if Mr. Heinricht were to "disappear." Over the course of several hours, Cleland drank beer and Ms. Eichelberger engaged him in conversation because she wanted to keep track of his whereabouts.

{¶21} Ms. Eichelberger testified that Cleland left the bar around 8:10 p.m. Mr. Heinricht was also working that evening. Tamara Simak, who worked with Mr. Heinricht at Starbucks, testified that he worked from 6:00 p.m. until 11:30 p.m. that evening. Although Mr. Heinricht ordinarily walked to and from work, Ms. Simak recalled that he asked her for a ride home that night "because he didn't want to get jumped." Ms. Simak dropped him off at 11:45 p.m. She is the last person who saw Mr. Heinricht alive.

{¶22} Ms. Eichelberger returned home from work shortly after 12:30 a.m. on October 2nd to a darkened apartment. She found Mr. Heinricht on the futon adjacent to

the pass-through wall between the living room and kitchen areas in the apartment. He was unconscious, with a noose around his neck attached to a rope that led to the kitchen. Ms. Eichelberger cut the rope, asked a neighbor to call 911, and attempted to resuscitate Mr. Heinricht. According to the testimony of the officers who soon arrived at the scene, Ms. Eichelberger was hysterical to the point of physical distress. She told the officers that she believed Cleland was responsible and that he would be boarding a plane for Hawaii first thing that morning. The officers also testified that Ms. Eichelberger recognized the knot in the noose as "military" in nature. Residents of a neighboring apartment building testified that they saw a male of Cleland's build walking along the rooftop of Ms. Eichelberger's building shortly before midnight on the night of Mr. Heinricht's death.

{¶23} In the meantime, Cleland purchased gas for his rental car at 12:14 a.m. and drove to Cleveland Hopkins International Airport, where he sat in the waiting area and passed the time by sending flirtatious text messages to his girlfriend, Jessica Guzetti, which she agreed were like as "playing back and forth." Around 3:00 a.m., Cleveland police officers found Cleland sleeping in the waiting area. Officer Daniel Hayes testified that when they arrested Cleland, he was "very [] quiet, just calm." Over the course of three interviews with the Brunswick police department, Cleland confessed that he had typed the fake suicide note in Hawaii as an attempt to scare Mr. Heinricht and that he broke into Mr. Heinricht and Ms. Eichelberger's apartment, choked Mr. Heinricht, and staged the scene to look like a suicide attempt.

{¶24} With this evidence in mind, a reasonable trier of fact could conclude beyond a reasonable doubt that Cleland was the perpetrator, and his convictions are not based on insufficient evidence.

{¶25} When considering whether a conviction is against the manifest weight of the evidence, this Court applies a different standard. We must:

> "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, 340.

Cleland's arguments regarding the weight of the evidence concern the lack of physical evidence corroborating his confession and the reliability of the confessions themselves and his own contradictory testimony at trial to the effect that an unknown person committed the crime, forcing him to watch and, ultimately, to confess falsely.

{¶26} As an initial matter, this Court must emphasize that our consideration of the weight of the evidence is by necessity limited to the trial court record. Consequently, although Cleland's appellate brief emphasizes many facts related to Mr. Heinricht's alleged criminal history which, according to him, cast doubt on the identity of the killer, those facts were not in evidence in the trial court, despite citations to the record that make it appear that they were. These statements must be disregarded in our analysis.

{¶27} According to Cleland's testimony at trial, a masked man was lying in wait for him in his rental car when he left the bar where Ms. Eichelberger worked. Although Cleland stated that the unidentified man always wore a mask, he was also able to describe him at trial. Cleland testified that the stranger forced him to drive to Hinckley Lake,

where he removed him from the car, secured his wrists behind his head with tape, and threatened his young niece if Cleland refused to cooperate with him by telling the police what he was told to say. The masked man then drove him back to Brunswick, parked in an adjacent apartment complex, and walked with Cleland to Mr. Heinricht's apartment building. Despite testimony that no tape residue was found on Cleland's clothing and that Detective Weinhardt did not observe any areas on his wrists where tape may have removed hair, Cleland testified that once they were inside the apartment, the man taped his wrists and ankles, and they waited for Mr. Heinricht. When he returned home from work, the stranger choked him, staged the suicide scene, and told Cleland to take the blame.

{¶28} Cleland maintains that the physical evidence collected by police supports his version of events, but this argument mischaracterizes the testimony at trial regarding that evidence. For example, Cleland has argued that the signature on the typewritten suicide note could not be linked to him and that police erred by failing to submit any other exemplars for comparison. In actual fact, Andrew Szymanski, who conducted the handwriting analysis, testified that the single handwritten word on the suicide note was an insufficient sample for comparison under any circumstances, and that it would not have mattered if other exemplars had been submitted for comparison. Similarly, testimony about the absence of fingerprints that could be identified as Cleland's occurred in the context of testimony from police officers that few fingerprints at the scene were of a quality that could be submitted for analysis. Finally, although the State's DNA expert could not testify to a reasonable degree of scientific certainty that Cleland's DNA was on

the rope found around Mr. Heinricht's neck, she did testify that a mixture of DNA was found on the rope and that there was a statistical probability that elements of the DNA profile were consistent with Cleland, Ms. Eichelberger, and Mr. Heinricht.

{¶29} Our thorough review of the record leads to the conclusion that this is not the exceptional case in which the evidence weighs heavily in favor of Cleland. Instead, the weight of the evidence supports the conclusion that Cleland committed the crimes in this case rather than an unidentified individual. Cleland's convictions are not against the manifest weight of the evidence.

{¶30} Cleland's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR III

"PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT AT TRIAL DENIED APPELLANT SHAUN M. CLELAND A FAIR TRIAL, AS GUARANTEED UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION, WHERE THE PROSECUTOR ACCUSED APPELLANT'S TRIAL COUNSEL OF LYING TO THE JURY."

{¶31} Cleland's third assignment of error is that the State's remarks at the beginning of closing argument disparaged trial counsel in such a way that the jury was predisposed against Cleland and that, consequently, they denied him a fair trial. We disagree.

{¶32} When a defendant alleges that remarks by the prosecutor during closing argument denied him a fair trial, we consider "whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith* (1984), 14 Ohio St.3d 13, 14, citing *United States v. Dorr* (C.A. 5, 1981), 636 F.2d 117.

In so doing, we are mindful that while some latitude is afforded to the State in closing arguments,

> "[a] prosecutor is at liberty to prosecute with earnestness and vigor, striking hard blows, but may not strike foul ones. * * * The prosecutor is a servant of the law whose interest in a prosecution is not merely to emerge victorious but to see that justice shall be done. It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury." (Internal citations omitted.) *Smith*, 14 Ohio St.3d at 14.

Allegedly improper comments by the prosecutor are considered in the context of the whole trial, and "[a]n improper comment does not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *Treesh*, 90 Ohio St.3d at 464, citing *Smith* at 15.

**{¶33}** In this case, Cleland points to a single instance of alleged misconduct by the prosecutor. Because the prosecutor's statements followed close on the heels of a statement by Cleland's own attorney, it is important to consider them together.

> "[BY DEFENSE COUNSEL:]        Reasonable doubt. I believe you people will be able to do and come back with a verdict consistent with the evidence as you've determined in this case.
>
> "As the prosecutor argues to you, I want you to think about some of the things that I brought up and see whether or not he can answer those questions because those questions must be answered by the State of Ohio because if you have doubt then by law, then by law you must vote not guilty."
>
> " * * *
>
> "[BY THE STATE:] Folks, what [defense counsel] just said is clearly wrong. It's not if you have doubt. That's not the law and you'll hear from Judge Kimbler in a few minutes it's if you have a reasonable doubt, a doubt based on reason and common sense. So you should ask yourself * * * why did you just tell us something that's wrong? * * * [H]ow can you stand in this court and say these things with a straight face[?]

The prosecutor, therefore, did go beyond responding to defense counsel's statement to implying dishonesty on his part. When a prosecutor accuses defense counsel of lying during closing arguments, it is misconduct. *State v. Sanders* (2001), 92 Ohio St.3d 245, 270, citing *State v. Keenan* (1993), 66 Ohio St.3d 402, 405-406.

{¶34} Although a strong curative instruction can mitigate the prejudicial effect of the misconduct, *Sanders* at 270, no curative instruction was given in this case, and we note that the trial record is confusing at this point. Defense counsel objected to the prosecutor's statement and a sidebar was had on the record. As the two lawyers argued among themselves, the transcript reflects that the prosecuting attorney said, "You know what, withdrawn. * * * Let him say what he wants to say." In the presence of the jury, the prosecutor then said, "All right, the objection's withdrawn, Your Honor" and continued his closing argument. Taking the transcript at face value, it appears that the prosecutor withdrew the statement to which Cleland had objected and Cleland offered no other objection. Neither, however, did the trial court instruct the jury to disregard the prosecutor's statement or offer any other instruction on the subject.

{¶35} Nonetheless, when viewed in the context of the entire trial, the prosecutor's single statement did not cause substantial prejudice to Cleland because it is clear beyond a reasonable doubt that the jury would have found Cleland guilty regardless. See *Treesh*, 90 Ohio St.3d at 464. Cleland's third assignment of error is overruled.

**ASSIGNMENT OF ERROR V**

"THE TRIAL COURT ERRED BY IMPOSING CONSECUTIVE SENTENCES FOR DEFENDANT'S KIDNAPPING AND AGGRAVATED BURGLARY CONVICTIONS ON THE ONE HAND, AND THE AGGRAVATED MURDER CONVICTION [ON] THE OTHER HAND, WHERE THOSE KIDNAPPING AND AGGRAVATED BURGLARY OFFENSES WERE ALLIED OFFENSES OF SIMILAR IMPORT TO THE FIVE ALTERNATIVELY-CHARGED AGGRAVATED MURDER AND MURDER OFFENSES WHICH MERGED FOR PURPOSES OF SENTENCING PURSUANT TO R.C. 2941.25."

**{¶36}** Cleland's final assignment of error is that the trial court erred by sentencing him for allied offenses of similar import. Specifically, he maintains that his convictions for kidnapping and aggravated burglary should have merged into the remaining conviction for purposes of sentencing.

**{¶37}** In *State v. Johnson*, 128 Ohio St.3d 153, 2010–Ohio–6314, the Ohio Supreme Court held that "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." Id. at syllabus. Since then, this Court has consistently remanded cases for further proceedings in the trial court to apply *Johnson* for the first time. In light of our precedent, it is therefore appropriate to remand this case so that the trial court can apply *Johnson* in the first instance. Cleland's third assignment of error is sustained.

III.

**{¶38}** Cleland's first, second, third, and fourth assignments of error are overruled. His fifth assignment of error is sustained. This matter is affirmed, in part, and reversed, in part, and is remanded to the trial court for consideration of whether Cleland's convictions should merge for purposes of sentencing under *Johnson*.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

DONNA J. CARR
FOR THE COURT

BELFANCE, P. J.
MOORE, J.
CONCUR

APPEARANCES:

FRANK C. GASPER, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW KERN, Assistant Prosecuting Attorney, for Appellee.